## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ZACH WESTER, Derivatively on Behalf of Nominal Defendant APPHARVEST, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| KIRAN BHATRAJU, CIARA BURNHAM, GREGORY COUCH, ANNA MASON, MARTHA STEWART, R. GEOF ROCHESTER, JEFFREY UBBEN, ROBERT J. LAIKIN, JONATHAN WEBB, DAVID LEE, and LOREN EGGLETON, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| APPHARVEST, INC., | ) ) | |
| Nominal Defendant. | ) | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Zach Wester ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant AppHarvest, Inc. ("AppHarvest" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff's alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of publicly available documents concerning AppHarvest, transcripts of conference calls with analysts, announcements concerning the Company, filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by, and regarding,

AppHarvest, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought on behalf of AppHarvest against certain officers and members of the Company's Board for breach of their fiduciary duties to the Company and its shareholders as set forth herein.

2.      AppHarvest is an applied agricultural technology company that develops and operates high-tech indoor farms to produce fresh, chemical-free, non-GMO produce.

3.      As alleged herein, the Company's facility located in Morehead, Kentucky (the "Morehead Facility") experienced lower saleable yield, quality and prices, and increased distribution and transportation fees on product returns due to inadequate employee training and hiring and retention issues.

4.      Controlled Environment Agriculture ("CEA") allows companies to cultivate and harvest crops year-round through indoor farming. CEA is not a major source of U. S. produce supply because it is not competitively priced as compared to traditional farming.  CEA's are only able to compete by scaling production. The Company's business plan was to achieve profitability by building twelve enormous CEA facilities by 2025, including the Morehead Facility. The Morehead Facility includes the Company's executive offices and corporate headquarters, a Packhouse, a retention pond the size of seventy Olympic swimming pools, and a sixty acre Greenhouse.

5.      Despite CEAs' extensive use of technology, successful operations are dependent upon reliable and efficient labor for planting, picking, packing, and quality control. The Company's operations were, therefore, dependent on its ability to effectively manage its

workforce.

6.      On September 28, 2020, the Company entered into a business combination agreement with Novus Capital Corp. ("Novus"), a SPAC, to become a publicly traded company.

7.      The Company initiated operations at its Morehead Facility shortly thereafter by planting beefsteak and on-the-vine varieties of tomato in, or about, November 2020 and January 2021, respectively. To fulfill its labor requirements, AppHarvest intended to increase its workforce from less than 70 employees to 500.

8.      The Company, however, failed to provide adequate training to its new workers and also failed to retain essential personnel. These workforce issues caused widespread, but publicly undisclosed, issues. According to former employees, Company workers damaged a "shocking amount" of tomatoes in the Morehead Facility, as much as 5% to 10% of total tomato production.

9.      The staffing issues also resulted in undisclosed quality control issues. According to former employees cited in the securities class action captioned *In re AppHarvest Securities Litigation*, Case No. 21-cv-7985-LJL (S.D.N.Y.) (the "Securities Class Action"), during the relevant time period "half" of the tomatoes grown and inspected at the Morehead Facility were either USDA Grade No. 2, or "Bad," as opposed to USDA Grade No. 1, which meant they were discarded and not sold at all.

10.      According to former employees cited in the Securities Class Action, the orientation process, which included a movie about the Company's positions on social issues, was "a joke." Employees were not instructed how to perform their job, nor provided any instruction about how to identify a USDA Grade No. 1 tomato. According to the witnesses, there was also a "shocking" amount of employee turnover, with two to three employees leaving the Company each week, and about "50% to 60%" of Greenhouse personnel leaving after their first month. The staffing issues

were exacerbated by the COVID-19 pandemic, with "a couple" of employees per team calling out sick every week and quarantining for weeks at a time.

11.    The Individual Defendants, however, falsely represented that the Company successfully staffed the facility and scaled production to plan.  The Individual Defendants also falsely claimed the Company's outlook was "supported by early sales from [the Company's] first harvest;" the result of "favorable crop yields and market pricing;" and supported by "encouraging operating and financial performance of our Morehead Facility and our team's ability to scale the business."

12.    Despite these positive statements, the Company would ultimately disclose in its Q2 2021 Quarterly Report on SEC Form 10-Q, that even previously, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" such as "lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees" which were incurred from "re-pack and re-sort costs" associated with product returns. Defendant David Lee (the Company's President and a member of the Board) admitted on the Q2 Earnings Call that the Company's "executional challenges" were "very real in our first major full season of harvest as a company."

13.    Moreover, internal reports required by the Company's agreement with its exclusive distributor and sales partner Mastronardi Produce Limited (the "Mastronardi Morehead Agreement"), included a "future forecast" of sales for each harvesting season in consultation with Mastronardi. These reports apprised the Individual Defendants of production shortfalls in real-time. According to the Securities Class Action, Confidential Witness 3 ("CW3"), the Company's ERP system tracked and reported actual results as compared to forecasts, including "daily, weekly,

and monthly greenhouse production." In addition, the projections approved by Defendant Eggleton (the Company's Chief Financial Officer), included details such as expected yield, sales (including a breakdown by USDA Grade No. 1 versus USDA Grade No. 2 tomatoes), costs, returns, market price, expected returns and expected damaged tomatoes.

14.     The Individual Defendants, however, misrepresented the facts concerning the Company's performance in order to close two large credit facilities in Q2 2021. Lenders wanted confirmation that the Company could successfully scale up operations in the first quarter of 2021. The Company closed these deals because the Company's "banking partners" could see the Company was purportedly "bankable" and "the business model is assured." In addition, the Individual Defendants sought to maintain the Company's artificially inflated stock price to facilitate AppHarvest's acquisition of robotics company Root AI, using approximately $50 million in the Company common stock as currency. The acquisition of Root AI would purportedly enable the Company to leverage technology to reduce operating costs.

15.     Defendant Jeffrey Ubben, a member of the Company's Board of Directors ("Board"), exploited his knowledge of the undisclosed problems facing AppHarvest and sold 3 million shares, or roughly 25% of his holdings, at an average price of $16.50 per share for $49.5 million in proceeds on or about June 10, 2021.

16.     On August 11, 2021, the Company issued its Q2 2021 results and updated its fiscal year 2021 outlook, announcing net sales of $3.1 million and a $32 million net loss. The Company also lowered full-year 2021 net sales guidance to a range of $7 million to $9 million and EBITDA guidance to a range of a loss of $70 million to $75 million. The Company explained that second quarter 2021 results were adversely impacted by "labor and productivity challenges result[ing] in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher

distribution and shipping fees." In a Q2 Earnings Call, Defendant Eggleton stated that the "primary driver" of the guidance reduction was "the lower net sales expectation, due to the quality challenges we encountered in ramping up our first facility and higher-than-expected cost of goods sold with labor farm costs, associated with lower-than-expected labor productivity."

17.     On this news, the Company's common stock price fell $3.46 per share, or approximately 29%, from $11.97 per share at market close on August 10, 2021, to $8.51 per share at market close on August 11, 2021.

18.     On March 2, 2022, lead plaintiff in the Securities Class Action filed an amended class action complaint.

19.     In addition to the costs and expenses related to defending itself against the Securities Class Action, and exposing AppHarvest to potential liability for class-wide damages, the Individual Defendants' misconduct has subjected the Company to costs incurred in connection with AppHarvest's internal investigations, wasting of corporate assets, and enabled the Individual Defendants who were improperly overcompensated by the Company, to unjustly enrich themselves.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This action is not a collusive action designed to confer jurisdiction on a court of the

United States that it would not otherwise have.

23.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  A substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

*Plaintiff*

25.     Plaintiff is, and has been at all relevant times, a continuous shareholder of AppHarvest.

*Nominal Defendant*

26.     Nominal Defendant AppHarvest is incorporated under the laws of Delaware with its principal executive offices located at 500 Appalachian Way, Morehead, KY 40351.

*Director Defendants*

27.     Defendant Kiran Bhatraju ("Bhatraju") was a director at all relevant times. Defendant Bhatraju is the Chairperson of the Compensation Committee and a member of the Sustainability Committee. According to the Company's public filings, Bhatraju received $126,272 in 2021 in compensation from the Company.

28.     Defendant Ciara Burnham ("Burnham") was a director at all relevant times. Defendant Burnham is also member of the Audit Committee and Chairperson of the Nominating and Corporate Governance Committee. According to the Company's public filings, Burnham received $79,048 in 2021 in compensation from the Company.

29.     Defendant Gregory Couch ("Couch") was a director at all relevant times. Defendant Couch is a member of the Nominating and Corporate Governance Committee, and formerly served as a member of the Audit Committee. According to the Company's public filings, Couch received $126,272 in 2021 in compensation from the Company.

30.     Defendant Anna Mason ("Mason") was a director at all relevant times. Defendant Mason is a member of the Compensation Committee and Sustainability Committee. Defendant Mason serves as Managing Partner of Rise of the Rest Seed Fund at Revolution, a position she has held since April 2021, and previously served as Partner from December 2017 to April 2021 and Director of Investments of Rise of the Rest Seed Fund from June 2016 to December 2017. Rise of the Rest Seed Fund at Revolution owns 5.3% of the outstanding shares of the Company. According to the Company's public filings, Mason received $57,105 in 2021 in compensation from the Company.

31.     Defendant Martha Stewart ("Stewart") was a director at all relevant times. Defendant Stewart is a member of the Compensation Committee. According to the Company's public filings, Stewart received $126,272 in 2021 in compensation from the Company.

32.     Defendant R. Geof Rochester ("Rochester") has served as a member of the Board since April 2021. According to the Company's public filings, Rochester received $152,744 in 2021 in compensation from the Company.

33.     Defendant Jeffrey Ubben ("Ubben") was a director at all relevant times, until his resignation from the Board effective March 3, 2022. Defendant Ubben was also member of the Nominating and Corporate Governance Committee. Defendant Ubben currently serves as the Founder and Chairman of Inclusive Capital Partners, L.P. ("Inclusive"), a position he has held since July 2020. Inclusive owns 8.7% of the outstanding shares of the Company. These shares are

held by Inclusive Capital Partners Spring Master Fund, L.P. ("Inclusive Capital"). Ubben is the controlling member of the management committee of Inclusive Capital Partners, L.L.C., the general partner of Inclusive Capital Partners, L.P., the investment manager to Inclusive Capital Partners Spring Master Fund, L.P. On or about June 10, 2021, Ubben filed a Form 4 with the SEC reporting that Inclusive Capital, which he controlled, sold 3,000,000 shares of AppHarvest stock – comprising more than 25% of Ubben's Company holdings – at $16.50 per share for proceeds of approximately $49,500,000. Defendant Ubben is a controlling shareholder of the Company. Thus, the other defendants in this action would not consider suing Defendant Ubben in fear of them losing their lucrative positions as Board members and/or executives. According to the Company's public filings, Ubben received $126,272 in 2021 in compensation from the Company.

34.    Defendant Robert J. Laikin ("Laikin") was a director at all relevant times, until his resignation from the Board effective February 7, 2022. Laikin currently serves as Chief Executive Officer of Novus Capital Corporation II. According to the Company's public filings, Laikin received $126,272 in 2021 in compensation from the Company.

35.    Defendants referenced in paragraphs 27 through 34 are herein referred to as the "Director Defendants."

***Officer Defendants***

36.    Defendant Jonathan Webb ("Webb") was the Chief Executive Officer ("CEO") of the Company at all relevant times. Defendant Webb is also the founder of the Company and a Board member. According to the Company's public filings, Webb received $ 33,087,859 in 2021 in compensation from the Company.

37.    Defendant David Lee ("Lee") served as the Company's President since January 2021 and as a member of the Board since August 2020. According to the Company's public filings,

Lee received $23,239,211 in 2021 in compensation from the Company.

38.     Defendant Loren Eggleton ("Eggleton") was the Chief Financial Officer ("CFO") of the Company at all relevant times. According to the Company's public filings, Eggleton received $ 358,784 in 2021 in compensation from the Company.

39.     The Director Defendants and Defendants Webb, Lee, and Eggleton are collectively referred to herein as the "Individual Defendants".

***Non-Parties***

40.     On March 7, 2022, the Board appointed Patrick Halfmann ("Halfmann") to serve as a director of the Company, effective as of March 7, 2022. The Board also appointed Halfmann to serve as a member of the Audit Committee and Sustainability Committee of the Board.

41.     On February 9, 2022, the Board appointed J. Kevin Willis ("Willis") to serve as a director of the Company, effective as of February 19, 2022. The Board also appointed Willis to serve as chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee of the Board, effective as of February 19, 2022.

42.     On February 7, 2022, Defendant Robert J. Laikin notified the Board of his resignation from the Board and all committees thereof effective immediately.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers and directors of AppHarvest, and because of their ability to control the business and corporate affairs of AppHarvest, the Individual Defendants owed AppHarvest and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AppHarvest in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of AppHarvest and its shareholders so as to benefit all shareholders equally.

44.     Each director and officer of the Company owes to AppHarvest and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

45.     The Individual Defendants, because of their positions of control and authority as directors and officers of AppHarvest, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

46.     To discharge their duties, the officers and directors of AppHarvest were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

47.     Each Individual Defendant, by virtue of his or her position as a director and officer owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of AppHarvest, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious harm to the Company.

48.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ stock exchange, the Individual Defendants had a fiduciary duty to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and

materially misleading information regarding the Company's business, prospects, and operations. The Individual Defendants also had a fiduciary duty to disclose the material information necessary to prevent other public statements, including those in its regulatory filings with the SEC, from being materially false and, so that the market price of the Company's common stock was based upon truthful, accurate, and fairly presented information.

49.     To discharge their duties, the officers and directors of AppHarvest were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of AppHarvest were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to AppHarvest's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how AppHarvest conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of AppHarvest and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AppHarvest's operations would comply with all applicable laws and AppHarvest's public statements, financial statements and regulatory filings were accurate;

(f)     adequately monitor the Company's officers and employees to ensure that their public statements about the Company were complete and accurate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

50.     Each of the Individual Defendants further owed AppHarvest and its shareholders the duty of loyalty requiring that they favor the interest of AppHarvest and its shareholders over their own while conducting the affairs of the Company, and that the Individual Defendants refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

51.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AppHarvest and were at all times acting within the course and scope of such agency.

52.     Because of their advisory, executive, managerial, and directorial positions with AppHarvest, each of the Individual Defendants had access to adverse, non-public information about the Company.

53.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AppHarvest.

## APPHARVEST'S CODE OF BUSINESS CONDUCT AND ETHICS

54.     AppHarvest's Code of Conduct exists to reflect the "business practices and principles of behavior" that support the Company's commitment "to maintaining the highest standards of business conduct and ethics."

55.     The Company requires each of its employees, officers and directors to sign an acknowledgment form confirming that they have received, read, understand and agree to comply with the Code of Conduct and that they understand and agree to comply with its provisions.

56.     In a section titled "Legal Compliance," the Code of Conduct states:

Obeying the law is the foundation of this Code. Our success depends upon each employee, officer and director operating within legal guidelines and cooperating with local, national and international authorities. We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Compliance Officer.

Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties.

57.     In a section titled "Insider Trading," the Code of Conduct states:

Employees, officers and directors who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes. All non-public information about the Company or about other companies is considered confidential information. To use material, non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to the Company's Insider Trading Policy for more detailed information.

58.     In a section titled "Financial Integrity," the Code of Conduct states:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others. We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees, officers and directors who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent. Any employee, officer or director who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee or one of the other compliance resources described in Section 16.

### APPHARVEST'S AUDIT COMMITTEE CHARTER

59.     AppHarvest's Audit Committee Charter states that the purpose of the Audit Committee is to:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

- maintain and foster an open avenue of communication with the Company's management, internal audit group (if any) and Auditors;

- review any reports or disclosures required by applicable law and stock exchange listing requirements;

- oversee the design, implementation, organization and performance of the Company's internal audit function (if any);

- help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and

- provide regular reports and information to the Board.

60.     In a section outlining the Audit Committee's responsibilities relating to financial review and disclosure, the Audit Committee Charter states, among other things:

**6.      Audited Financial Statement Review; Quarterly and Annual Reports**. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

**7.      Earnings Announcements**. The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information).

**8.      Proxy Report**. The Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

61.      In a section outlining the Audit Committee's responsibilities relating to internal control and procedures, the Audit Committee Charter states, among other things:

**15.      Internal Control over Financial Reporting; Disclosure Controls**. The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

## SUBSTANTIVE ALLEGATIONS

*Background*

62.      The Company was founded on January 19, 2018 by Defendant Webb. The Company grows all of its crops indoors using CEA technology. CEA blends "a combination of engineering, plant science, and computer managed greenhouse control technologies used to optimize plant growing systems, plant quality, and production efficiency."

63.      CEA techniques include the use of a fixed greenhouse structure, rainwater collection, natural and/or artificial light, and specialized harvesting technology. By using high tech

greenhouses, CEA producers can cultivate and harvest crops year-round, optimize their supply, and plan harvests during exact peak price points for fruits and vegetables—which track the traditional growing and harvesting seasons of outdoor agriculture. For instance, on average, prices for crops like tomatoes have been lower when traditional outdoor agriculture harvests are at their seasonal peak, and prices, on average, have been higher during off seasons. CEA facilities which operate year-round can target peaks and plan around valleys.

64.     The design and construction of the Company's flagship facility located in Morehead, Kentucky. Although the Company had broken ground on construction projects in Berea and Richmond, Kentucky, the Morehead Facility was the Company's only operating CEA facility.

65.     On September 28, 2020, the Company and Novus entered into a business combination agreement, giving the private company a public listing and proceeds from the Novus IPO.

66.     On February 1, 2021, the Company announced it had completed the merger with Novus and that the resulting company would be renamed AppHarvest, Inc.

**AppHarvest Promoted Purported Labor Advantages**

67.     The rising demand for fruits and vegetables in the United Stated compared to existing domestic supply has necessitated significant imports of foreign produce.

68.     The Company promotes its Central Appalachian geographic location as a competitive advantage for several reasons: (i) production occurs closer to end-customers which reduces shipment times and costs and (ii) because Kentucky has reliable rainfall, unlike traditionally important producers of fruits and vegetables.

**AppHarvest Starts Tomato Production At Its Morehead Facility**

69.     On April 15, 2019, the Company secured financing for construction of the

Morehead Facility. Throughout the relevant time period, the Morehead Facility only produced tomatoes.

70.     On November 19, 2020, the Company announced it started planting beefsteak tomatoes on its first thirty acres of growing space, and the Company announced that beefsteaks began to be harvested in January 2021. According to CW3,[1] the Company planted tomatoes on the vine in January/February 2021 on the remaining thirty acres, and the Company announced that it began harvesting these crops in April 2021. In total, the Morehead Facility had 720,000 tomato plants growing heading into Q2 2021.

71.     On December 15, 2020, Defendants claimed that the Morehead Facility was intended to be the Company's first of twelve CEA facilities that were expected to go live by 2025.

72.     The Company's perishable products require a reliable source of demand so that the Company can optimize the timing of its sales Thus, on March 28, 2019, and as amended on December 18, 2020, the Company entered into the 10-year Mastronardi Morehead Agreement to sell tomatoes harvested at the soon-to- open Morehead Facility to Mastronardi Produce Limited.

73.     The first instrument comprising the Mastronardi Morehead Agreement, dated March 28, 2019, is titled the Purchase & Marketing Agreement Exclusive Production AppHarvest, LLC (United States), and was filed by Novus with the SEC on November 9, 2020 as Exhibit 10.20 to Form S-4. The second instrument, comprising the Mastronardi Morehead Agreement, dated December 18, 2020, is titled Amendment No. 1 To Purchase & Marketing Agreement Exclusive Production AppHarvest, LLC (United States), and was filed by Novus with the SEC on December 21, 2020 as Exhibit 10.31 to Form S-4/A.

---

[1] "CW__" refers to the Confidential Witnesses cited in the amended complaint filed in the Securities Class Action on March 2, 2022.

74.     Under the Mastronardi Morehead Agreement, Mastronardi became the Company's sole, exclusive marketing and distribution partner for all tomatoes, peppers, cucumbers, berries and leafy greens produced at the Morehead Facility. The Company is responsible for growing, producing, packaging and delivering all of its produce to Mastronardi, whereas Mastronardi is responsible for marketing, branding and distributing the Company's products to its customers.

75.     Mastronardi sells all of the United States Department of Agriculture ("USDA") Grade No. 1 produce that the Company grows at market prices and the Company receives the gross sale price of the products, less a marketing fee and Mastronardi's costs incurred in the sale and distribution of the products.

76.     The Mastronardi Morehead Agreement requires the Company to stay in close communication with Mastronardi regarding the Company's future estimated production, including joint sales and delivery forecasts for each "growing season." A growing season consists of the preparation, planting and harvesting of crops. The Company's annual summer "refresh," which starts in August, marks the beginning of a new growing season. The Mastronardi Morehead Agreement states:

> Given enough time to make adjustments before the beginning of each growing season, ***Grower and Mastronardi will consult with each other to plan future marketing and sales strategies for the following season***, including forecasting the type of seeds and products to be grown as well as the quantities that should be cultivated for the next season and ***the approximate pack and schedule of delivery together with a forecast of future sales*** (in each case a, "Future Forecast" and collectively with the Initial Forecast referred to as a "Forecast").

(Emphasis added).

77.     Under the Mastronardi Morehead Agreement, Mastronardi is obligated to purchase all of the Company's products that are at or above USDA Grade No. 1 standards.

78.     According to the Securities Class Action, CW2 confirmed that the Company's internal quality ranking system for tomatoes that had been sent from the Morehead Facility Greenhouse to the Packhouse for distribution consisted of three grades: USDA Grade No. 1, USDA Grade No. 2, and "Bad." Upon information and belief, CW2 stated that the Company designated any tomato as "Bad" if it was not commercially saleable. "Bad" tomatoes were thrown away in the Packhouse. CW2 described Grade No. 2 tomatoes as still being "edible" but having obvious visible deformity making them unfit for public display. CW2 stated Grade No. 2 tomatoes could be shipped to clients such as restaurants who would use the tomatoes, but not to grocery stores whose customers were unlikely to purchase tomatoes with imperfections. CW2 stated that the Company had different packaging that identified whether tomatoes in the box were USDA Grade No. 1 or USDA Grade No. 2. Therefore, the Company and its customers were able to identify which grade of tomatoes were being sent/received and thus assign the corresponding price to each box of shipped tomatoes.

79.     However, Mastronardi was not obligated to purchase any crops that fell below USDA Grade No. 1. Under the Mastronardi Morehead Agreement, Mastronardi is afforded a period of time after receiving products from the Company to inspect the Company's products and determine, in Mastronardi's sole discretion, whether the products satisfy USDA Grade No. 1. If Mastronardi rejects the Company's produce because it fails to satisfy Mastronardi's quality standards, the Company must accept the returned produce and bear all costs associated with returns of the product to the Company's Morehead Facility. Also, the Mastronardi Morehead Agreement provides that the Company shall accept any products that are returned by Mastronardi's customers (and bear all costs associated with such returns) when the customer determines that such products fail to satisfy USDA Grade No. 1 quality standards, and the fault was not caused by Mastronardi.

80.     Failing to produce tomatoes to Mastronardi that meet USDA Grade No. 1 presents considerable risk to the Company that it will not be able to sell its products at all. In fact, the Company admitted in its quarterly reports filed on Forms 10-Q for the first and second quarters of 2021, and two prospectuses in June 2021, that "[s]ubstantially all of our net sales are generated from the sale of tomatoes under an agreement with one customer, Mastronardi."

81.     Defendants knew that the Company needed to satisfy Mastronardi's quality demands. In fact, the Company filed at least eighteen documents with the SEC (including nine documents signed by Defendant Webb, two documents signed by Defendant Lee, and eight documents signed by Defendant Eggleton), stating that the Company was "highly dependent" on its relationship with Mastronardi and that "because Mastronardi acts as an intermediary between us and the retail grocers or foodservice providers, we do not have short-term or long-term commitments or minimum purchase volumes with them to ensure future sales of our products."

82.     Further, even though the Company retains the right to theoretically sell products which fail to meet USDA Grade No. 1, the Company is not permitted under the Mastronardi Morehead Agreement to market or sell such products as satisfying USDA Grade No. 1 and cannot command USDA Grade No. 1 prices in the market. The failure to meet USDA Grade No. 1 quality results in a significant impediment to pricing and sales.

83.     At all relevant times, Defendants knew that harvesting crops that meet the USDA Grade No. 1 standard was vital to the Company's business.

***Defendants Tout That The Company Is Efficiently Staffing Its Production Team To Meet Demand***

84.     In order to ensure the Morehead Facility's tomatoes were efficiently grown and picked to maximize USDA Grade No.1 yield, the Company required a labor force that was properly staffed and trained.

85.     The Company attempted to build a labor force from scratch at the beginning of the Company's first growing season in late 2020. However, the Company disclosed in its Annual Public Benefit Corporation Report for the year ended December 31, 2020, that the Company's "GOAL" was to staff the Morehead Facility with up to "500 LIVING WAGE JOBS[.]"

86.     Given the scale at which the Company needed to staff the Morehead Facility, and the time frame in which Defendants decided to simultaneously commence operations, Defendants knew that staffing would be material to investors who were observing whether the Company could execute on its CEA business model.

87.     Defendants made frequent statements regarding the progress of the Company's hiring efforts to assure investors that hiring and employee retention were among their highest priorities—and that the Company would have no problems scaling its business and achieving its forecasts.

88.     During a January 19, 2021 interview with the Associated Press, Defendant Webb stated that the Company received over 10,000 applications for its open positions at the Morehead Facility and hired 350 employees by late January 2021. On March 2, 2021, however, the Company announced that as of December 31, 2020, it had 224 employees. Then, on May 17, 2021, the Company announced that during a two week stretch in February it had hired an additional 100 employees for its Morehead Facility. These updates were similar to many others (provided below) that Defendants disseminated in order to convince the market that the Company was focused on staffing the Morehead Facility, because Defendants knew this was an issue that was monitored by the market in evaluating whether the Company would be able to scale its production and be profitable.

| Date | Type | Statement Regarding AppHarvest's Hiring Efforts |
|------|------|------------------------------------------------|
| 1/11/2021 | SEC Filing - 424B3 | "As of September 30, 2020, AppHarvest had 69 full-time employees, including 34 at its Lexington location and 35 at its Morehead facility…"

"Headcount increased from 15 employees as of September 30, 2019, to 69 employees as of September 30, 2020" |
| 3/2/2021 | SEC Filing - S-1/A | "Headcount increased from 15 employees as of December 31, 2019, to 224 employees as of December 31, 2020." |
| 3/15/2021 | Interview of Webb by Lupton Capital | "We've had nearly eight or nine thousand people apply to work at our company. We have nearly 400 people on the team right now." |
| 3/23/2021 | Article published on CBS News | "AppHarvest has created more than 500 jobs at their one Morehead facility." |
| 4/9/2021 | Interview of Webb by Cheddar News | "Here at AppHarvest we have about 550 employees…" |
| 4/21/2021 | News Release on AppHarvest website | "As of March 31, 2021, AppHarvest has created 500 jobs…" |
| 5/17/2021 | Investor Presentation in connection with Q1 Results | Touting Company's "500+ total employees" |
| 5/17/2021 | AppHarvest's Chief Sustainability Officer on the Q1 Earnings Call | "Our team has now grown to 500 employees at the end of the first quarter." |
| 6/30/2021 | Interview of Webb by Bloomberg | Touting Company's "550 people working now" |

89.     All of these updates contributed to the perception that Defendants were diligently building out a workforce to meet the Company's growing production needs. However, Defendants knew that its productivity was hampered by worker attrition and ineffective training.

***AppHarvest Suffered Significant Waste And Low-Quality Produce As A Result Of The Failure To Properly Train Employees***

90.     At the same time the Company began publicly trading and when the Morehead

Facility's first yields were being harvested, the Company was already experiencing severe challenges in producing USDA Grade No. 1 tomatoes due to problems with staffing, retention, and work execution. Former Company employees confirmed that the Company suffered productivity challenges from the very first harvest in January 2021.

91.     According to Securities Class Action CW1, work execution problems at the Morehead Facility's Greenhouse existed before harvesting even began and continued throughout CW1's tenure. CW1 described the frequency of the problems as occurring "pretty consistently" during CW1's employment at the Company.

92.     According to CW1, the Company's workers damaged a "shocking amount" of tomatoes in the Morehead Facility. CW1 stated that on a consistent basis, anywhere from 5% to 10% of the tomatoes on a given vine ended up being damaged by workers.

93.     CW1 also stated that the crops were destroyed in multiple ways. For instance, a main reason for waste that CW1 witnessed during her tenure was when any tomato, often overripe tomatoes, touched the ground. CW1 also stated that Greenhouse employees often pulled too hard on the plants, leading to the tomatoes being damaged or dropped.

94.     Further, according to CW1, throughout the Greenhouse, tarps were laid on the floor between the rows of plants which accumulated large quantities of decomposing leaves and "a lot of tomatoes on the ground."   CW1 stated that decomposing organic material fostered large numbers of gnats which rendered the floor of the Morehead Facility unsanitary. According to CW1, the gnats were so bothersome to employees that they would "eat you alive." CW1 further stated that the high temperatures in the Greenhouse (upwards of ninety degrees Fahrenheit for weeks at a time) led to spoilage. According to CW1, it was a Company rule that, when a tomato touched the ground (for instance, because employees mishandled the plant), the produce could not

be washed or saved—it was simply no longer saleable. CW1 said this was so even if the tomato was not ripe and was still attached to the plant.

95.     CW2 stated that tomatoes that had reached the Packhouse from the Greenhouse "constantly" had holes, cuts, scars, spots, were leaking fluid or flesh, or other imperfections. CW2 stated that even for those tomatoes that were not immediately damaged and discarded in the Greenhouse, "half" inspected in the Packhouse were not USDA Grade No. 1, but rather, were either Grade No. 2 or "Bad." According to CW2, "Bad" tomatoes included tomatoes with cuts, holes, bacteria, and mold. CW2 stated if there was mold on a single tomato in a box that had been inspected, it meant the entire box was considered "Bad" and was required to be discarded.

96.     CW1 attributed the observed waste to the Company's failure to train its employees. According to CW1, the orientation process was "a joke" and "the weirdest" orientation process CW1 had ever participated in. CW1 said orientation only entailed watching a movie regarding (at most fifteen minutes) dedicated to the Greenhouse, and the rest devoted to information concerning the Company as a company. CW1 stated nothing in the orientation process taught employees how to actually do the jobs they would be performing.

97.     CW1 stated that Crop Care Specialists were not given any instruction concerning how to identify a USDA Grade No. 1 tomato. With respect to the topic of "quality," the sole instruction Crop Care Specialists were given was that they should pick tomatoes that they considered to be "bright orange with a little bit of green" which would enable the fruit to ripen further. CW1 stated that after the initial orientation, Greenhouse personnel were required to watch very brief video training materials that lasted approximately fifteen minutes per task that a Crop Care Specialist could perform (e.g., picking, lowering, de-leafing, etc.). These video segments of the various tasks lasted two hours at most. Other than orientation and these cursory video segments,

CW1 stated Crop Care Specialists were not given any further formal training.

98.     CW2 stated that training in the Packhouse, both as a Packer and as a Quality Control Specialist, was essentially "trial by fire." CW2 stated that orientation consisted of filling out paperwork and being shown presentations of the Company's business strategy. While the entire presentation lasted only six to seven hours, the amount of time spent on quality was only about twenty-five or thirty minutes. Furthermore, throughout CW2's tenure, the quality standards "really changed on the fly," with some days' tomatoes containing small, healed cuts being deemed acceptable as USDA Grade No. 1 but on other days not acceptable. CW2 reiterated the quality standards changed "day to day" and "week to week" during CW2's tenure.

99.     CW2 described the information regarding quality standards that CW2 received at orientation and on the job as "just a little briefing" and "not real training." CW2 stated that this "100%" led to regular disagreement among the quality control staff about what qualified as USDA Grade No. 1—in some cases where half of the team believed tomatoes were of sufficient quality and the other half of the team disagreed. In such situations, CW2 stated it was necessary to go to Packhouse Supervisor Wayne Howard ("Howard"), who would go to Head Grower Jose "Pepe" Calderon ("Calderon"), to get up-to-date information on the quality standards.

100.    The quality of tomatoes shipped to Mastronardi or directly to end customers wildly fluctuated. Not only did this result in lower net sales if the tomatoes were USDA Grade No. 2 and sold for "little to no value," or "Bad" and discarded, but also resulted in higher distribution, packaging, and shipping expenses from returns. As Defendants later disclosed, the Company suffered returns, leading to "Distribution costs much higher than expected; Additional re-pack and re-sort costs resulting from poor quality mix (fewer USDA #1 tomatoes than expected)[.]"

101.    CW1 also confirmed productivity failures were caused by the Company's human resource policies such as pay and scheduling, and that insufficient and unreliable staffing led to reduced production. For instance, CW1 stated the Company offered Crop Care Specialists a "piece rate" bonus which entitled them to additional pay beyond their base pay rate for meeting productivity goals. CW1 observed throughout his/her tenure, the "piece rate" structure instituted by the Company caused employees to work too fast, which resulted in damage to the tomato plants.

102.    CW1 provided the example of when employees were tasked with lowering the plants to the ground and incentivized by the number of rows of tomato plants they could work through. Lowering was a method to improve the way the plants grew, but employees often worked fast and careless in order to qualify for "piece rate" compensation incentives. CW1 stated that Crop Care Specialists who were "lowering the plants" did not adhere to the proper procedures but "just threw over" the plants which caused tomatoes to fall, hit the ground, and become unsaleable.

103.    CW2 stated the "piece rate" incentive system also resulted in diminished quality. According to CW2, the piece-rate for pickers in the Greenhouse was based on the quantity of the tomatoes that were picked, regardless of quality. The piece rate bonus incentivized pickers to harvest as many tomatoes as they could, and quality suffered as a result.

**The Company's Productivity Challenges**

104.    The Company's productivity suffered for several reasons, including lack of training, duplication of work, conflicting directions over work assignments, and an inability to retain personnel. According to the confidential witnesses in the Securities Class Action, the Company's human resource policies compounded these difficulties.

105.    CW1 stated that to mitigate lost productivity, the Company increased its hourly requirements which in turn caused massive worker dissatisfaction and, according to CW1, a

"shocking" amount of turnover. CW1 stated that when CW1 was hired, employees were told they would get nine paid holidays, and that their work week would be 6:00 a.m. to 3:00 p.m. for five days a week. CW1 also stated that before the first harvest, the Company told workers that they would need to work holidays and that regular business hours would be extended to 4:00 p.m. Further, CW1 said "nine times out of ten", the Company would require workers to work Saturdays—an instruction that was not relayed to employees until late in the week, and "several times" even "after lunch" on Friday.

106.    CW1 stated that the Company's increased hours requirements were because of employee turnover, which required the remaining workers to "pick up the slack" for workers who had left. CW1 stated personnel "began jumping ship" as soon as the Company changed its hours policy, and that prior to the first harvest "at least one person a week" from CW1's team left the Company. During the first harvest, CW1 stated that one person from CW1's team left the Company approximately every one to two weeks for the remainder of CW1's tenure. CW1 stated personnel were not replaced, and that although CW1's team started with twenty to thirty personnel, that number fell to fourteen or fifteen by the end of CW1's tenure. Throughout the entire Morehead Facility Greenhouse, CW1 stated that two to three employees left the Company every week throughout CW1's tenure.

107.    The Company's inability to maintain a sufficient and dependable labor force at the Morehead Facility was corroborated by Defendants' own public disclosures. For instance, the Company announced that its "GOAL" was to operate the Morehead Facility with five hundred people. In the Company's first quarter 2021 earnings statements and during the Q1 Earnings Call, Defendants Webb and Lee stated that the Company reached that threshold. Yet, one quarter later, during the Q2 Earnings Call, Defendants admitted numerous times that the Company's workforce

had fallen by 20% to "400 people."

108.     CW2 stated that the Company had suffered incredibly high attrition, with upwards of "50% to 60%" of Greenhouse personnel leaving after their first month. CW2 stated that of the 40 to 50 personnel who were hired at the same time as CW2, only one individual is still employed by the Company.

**The COVID-19 Pandemic Increases Productivity Losses**

109.     According to CW1, although COVID-19-related absences began to taper off somewhat towards the end of CW1's tenure (July 2021), many workers did not come to work because of COVID-19. CW1 stated that from CW1's team alone, "a couple" of employees would call out sick each week because of COVID-19.

110.     According to CW1, when an employee called out of work due to COVID-19, they were required to quarantine for two weeks and were not replaced, so teams would be short-staffed by the amount of personnel that were out due to COVID-19. Further, CW1 stated the Company had no way to verify if an absent worker had actually contracted COVID-19, so theoretically any employee could take advantage of the pandemic if they wanted to take a two week leave of absence. CW1 said as a result of the employee absences, COVID-19 "definitely" negatively affected total employee hours worked, and production.

**Defendants Knew About the Company's Productivity and Labor Challenges**

111.     Defendants knew about the operational problems the Company was experiencing at the Morehead Facility and had access to internal Company reports regarding the same, but hid these issues to secure nondilutive credit line financing.

112.     CW1 stated Defendant Webb visited the Greenhouse one to two times every month throughout CW1's tenure to host tours for VIPs such as Martha Stewart (a member of the Board).

113.    By his own admission during an interview by Jonah Lupton of Lupton Capital on March 15, 2021, Defendant Webb was at the facility "every morning" at 5:00 am to greet the employees starting their shifts. Also, in an interview by Renita Sherbill of Seeking Alpha on June 3, 2021, Defendant Webb told Sherbill that due to the COVID-19 pandemic, Defendant Webb had fewer responsibilities to travel away from the Morehead Facility on behalf of the Company. Defendant Webb admitted to Sherbill that this additional free time allowed him to "do what [he] loves the most, which is sleep on the farms" and "go[] to our operations."

114.    Defendant Webb regularly took media appearances from within the Greenhouse. In a June 21, 2021 appearance on the Authentic Avenue Podcast, Defendant Webb stated that he regularly took media appearance from within the Greenhouse because he was "trying to show [investors] we're authentic. We're genuine. We, you know, we want to show the consumer, here's the way we're operating."[2]

115.    Additionally, the Company tracked its employees' productivity in real time and made that data publicly viewable within the Morehead Facility. According to CW1, after morning team meetings with the team's respective Assistant Grower, employees would grab their assigned infrared scanner and work in the rows of tomatoes in the Greenhouse. When employees finished working on a row, they scanned a marking at the end of a row to indicate it had been completed. CW1 stated that the scanned information was uploaded to the Company's digital file system, which

---

[2] September 29, 2020, TD Ameritrade Network, The Watch List; September 29, 2020, Yahoo Finance; September 30, 2020, CNBC, Squawk Box; September 30, 2020, Cheddar News; January 19, 2021, Yahoo Finance; January 20, 2021, Cheddar News; February 1, 2021, NASDAQ; February 1, 2021, Fox Business, The Claman Countdown; February 1, 2021, Cheddar News; February 1, 2021, Yahoo Finance; February 2, 2021 CNBC, Squawk Box; March 1, 2021, YouTube, Bobby Clark, "Jonathan Webb – Startup to NASDAQ in 3 years"; March 18, 2021, CNBC, Mad Money with Jim Cramer; March 23, 2021, YouTube, CBS Mornings, "Entrepreneur hopes to make Appalachia hub for indoor farming"; May 18, 2021, Pattrn; August 8 , 2021, CNN.

was then used to track the productivity of each worker. CW1 stated that the Company encouraged competition among Greenhouse personnel by displaying scanned information on a so-called "leader board" located in the "canteen area" of the Greenhouse, which was updated daily.

116.    The Company's real-time production information was then tracked against forecasts. The Mastronardi Morehead Agreement required the Company to work in consultation with Mastronardi to prepare a detailed forecast before the growing season, including forecasts of "sales" and "delivery" date. CW3 stated that the Company did prepare forecasts for the first growing season at the Morehead Facility. CW3 also stated that CW3 was tasked with creating a "routing" for beefsteak tomatoes in the Company's ERP system, Microsoft Dynamics. A routing involves identifying and mapping out all the steps, processes, and unit costs that are necessary to create a unit of production. CW3 stated that in connection with this assignment, Defendant Eggleton provided CW3 spreadsheets including detailed profit and loss projection documents which Defendant Eggleton had approved. CW3 stated that the Company's projections provided by Defendant Eggleton included many details such as forecasted yield, sales, costs, returns, market price, expected returns and expected damaged tomatoes.

117.    The Company admits that these same categories of information are tracked and the actual results are compared against the forecasts described by CW3. For instance, in an advertisement posted by the Company soliciting applications for a "Senior Cost Accountant" (the same position CW3 held, and therefore a position that worked directly with Defendant Eggleton), the Company describes various internal reporting processes including "daily, weekly, and monthly greenhouse production" and cost reviews and numerous reports that were provided to "management," including reports of "emerging issues" related to "cost performance" (something that Defendants admitted in their Q2 Form 10-Q had been disrupted by operational problems for

the entire "six months" ended June 30, 2021):

**What You'll Do**

• Setting standard costs and support in creation/maintenance of new Item No., BOM(s), & Routing(s) in ERP system.
• Review the ***daily, weekly, and monthly greenhouse production and record cost accounting transactions***.
• Review ***monthly Purchase Variances, revision of standard costs, or inventory revaluation entries.***
• Review COGS actual vs. standard and ***provide margin analysis to management.***
• Investigate cycle counts & review consumption entries to identify incorrect posts and ***provide management with a correcting entry***
• Maintain and report COGS functions including inventory transactions, unsupported inventory, and gross margin analysis.
• ***Prepare reporting for senior management on cost performance vs. budget and highlight and investigate emerging issues.***
• Develop KPI for the Greenhouse and Packhouse Operations.
• Assist with analysis of capital expenditure requests and calculations of ROI for capital spending.
• Manage fixed asset accounting including detailed ledgers, roll forwards, depreciation/amortization schedules and asset tagging.
• ***Work with management to develop strong inventory control*** that meets SOX Compliance, and assist with setting up appropriate safety stock levels and leverage ERP for managing/ordering inventory.
• Monitor inventory activity and processes to ensure they are consistently applied throughout operations.
• Participate in ***month end close activities*** (journal entries, reconciliations, review/analysis of inventory & COGS) as directed and maintaining integrity of ***monthly inventory reports***.
• Other ad hoc greenhouse production related analysis as required.
• Participation in physical inventory counts and asset tagging may be required.

118.     During an earnings call with analysts to discuss the Company's first quarter fiscal 2021 quarter results (the "Q1 Earnings Call"), Defendants alluded the fact that the Company was facing operational headwinds due to insufficient or non-existent "training" with respect to the actual growing and harvesting process. In fact, as Defendants would be forced to admit just three months later, and consistent with CW accounts, the Company lacked any kind of actual training program and was unable to train the large number of individuals being hired to scale production,

in light of the significant turnover.

119.    Defendant Lee stated on the Q1 Earnings Call: "With momentum from season one, we'll take July and August during our summer refresh and prepare for Morehead 2.0, *the operation of which will benefit from new training that we will anticipate will support higher productivity in Q4.* Summer refresh will be an annual activity for us, where we will not produce for about 8 weeks in Q3 as we prepare for the next season."

120.    Defendant Eggleton stated on the Q1 Earnings Call that "[g]ross loss was $4.5 million, which reflects the phased launch of commercial operations and sales at our Morehead Facility and the demands required of training our labor force of our newly started operations. We expect gross margin to *improve over the coming quarters as we seek to increase our utilization and yield, leading to greater labor productivity* and overhead leverage over a larger number of pounds sold."

121.    Although Defendants Lee and Eggleton made these vague statements that are reflective of their state of mind, Defendants did not disclose any of the underlying issues, such as the significant waste and understaffing at the Morehead Facility or the resulting effects on the Company's operations, product quality, sales, revenue, and costs.

122.    Defendants later admitted in the corrective disclosures that the Company had begun taking undisclosed remedial actions months earlier to address the Company's productivity issues. These actions evidence Defendants' knowledge of the issues at the time they made their false and misleading statements. For instance, on August 11, 2021, during the Company's Q2 Earnings Call, Defendant Lee stated:

> [T]he speed bumps associated with our initial harvest are fixable, and *we've already deployed solutions against these problems in advance of our next harvest.* For example, we overhauled our pack house to minimize bottlenecks while increasing quality checks, which helps us deliver our targeted volume of USDA grade #1

tomatoes. We're *also implementing changes to our piece rate or bonus system* to drive improvements in our operational productivity and ability to meet surges in demand for plant care. And lastly, *we changed operational leadership* and the chain of command structure within Morehead and all our future farms going forward. As of late July, I am now directly accountable for the performance inside our high-tech farms.

123.    Defendant Lee linked changes in "operational leadership" to productivity issues the Company experienced in its first tomato harvest season. For instance, in response to an analyst from Stephens, Inc. inquiring what "operational fine-tuning you're doing as you figure out how to get the optimal results and mix with your tomato crops[,]" Defendant Lee emphasized the Company's "chain of command" changes:

> And then I got to tell you that the management focus and simplification, having a clear chain of command, I am accountable to Jonathan and that we now have experienced operators running Morehead and with Julie helping optimize across our future network. I think that's really important. Having that absolute focus on daily delivery of results is the last piece that you'll see on that slide.

124.    Also, when Defendant Webb was asked by a Cowen analyst during the Q2 Earnings Call about "higher distribution fees" and "the impact of mix in Q2," Defendant Webb stated that the Company had "replaced management" to address the issues.

125.    However, Defendant Lee also misleadingly suggested during the Q2 Earnings Call that these "operational leadership" changes, including the operational restructuring at the managerial level had occurred only in the "past several weeks" preceding August 11, 2021:

> "[O]ne driver of the value we expect to deliver and one we've already completed today is to move forward with a smaller, more nimble corporate center. As part of this initiative, *in the past several weeks, we notified employees of restructuring action that eliminated a C-level position, reduced head counts and streamlined the structure of our corporate office*… Our restructuring has the intended effect of reducing our cost structure, *but it also represents a shift of resources toward our best opportunities in operations* and tech. We believe these businesses will benefit from a deeper level of investment *and focus* when they're supported by a smaller corporate office."

126.    Defendants' identification of operational issues and the purported remedial steps they were implementing had been identified or begun months earlier. For instance, the only "C-level" position the Company ever eliminated was the Chief Operating Officer ("COO") position held by Marcella Butler. Defendants disclosed the Board relieved Ms. Butler of her position as COO on April 12, 2021—without explaining the circumstances to investors—only four months after she had been promoted into that role, and four months before Defendants disclosed the truth concerning the financial condition and business prospects of the Company.

127.    Also, the employees that the Company hired in the second or third quarters of 2021 to address its operational issues were filling senior level positions, which would have required a reasonable recruitment period preceding the new hires' actual start date. These new hires' roles and responsibilities all concerned enhancing productivity of operations.

128.    For instance, the Company announced on August 11, 2021 that to "improve operational performance," Adam Reel was hired as Vice President of Supply Chain and Procurement "[e]arlier in the second quarter"—meaning his recruitment reasonably began in the first quarter. In this role, Mr. Reel is responsible for "ensuring implementation of best practices learned in the first growing season and deploying them as standard operating procedures." Mr. Reel reports to Ms. Nelson who reports to Defendant Lee.

129.    The Company announced on July 26, 2021 that it had hired Mark Keller as Senior Vice President, Software Applications Platform. In this role, Mr. Keller is responsible for "operationaliz[ing the Company's] Project TalOS platform." According to the Q1 2021 investor presentation posted on the Company's website on May 17, 2021, Project TalOS is a "comprehensive technology vision" that looked to: (i) "deliver consistent performance"; (ii) create "superior flavor driven by genetics to create pricing power"; and (iii) utilize a "farm management

platform to promote data-driven decision making" at the Morehead Facility. According to Mr. Keller's LinkedIn profile, Mr. Keller "Built the Software team from Scratch" and "Designed/Built the Mobile solution and Cloud Services Powering the future of Sustainable Agriculture."9

130.    Also, the Company announced on August 5, 2021 that it had hired Julie Nelson as Executive Vice President, Operations. In this role, Ms. Nelson is responsible for "driv[ing] productivity across [the Company]" and "optimiz[ing] operations to support profitable growth." Ms. Nelson reported to Defendant Lee. On February 24, 2022, the Company announced it promoted Ms. Nelson to COO, making Ms. Nelson the official replacement for Ms. Butler.

***Before Revealing The Truth, The Company Closed Deals On Financing For New CEA Facilities and Acquired Root AI, a Tech Start-up That Develops Robotic Harvesters***

131.    Before Defendants disclosed the operational and labor productivity problems that were impacting the Company's productivity, Defendants' false portrayal of the Company's operations throughout the first harvesting season allowed the Company to close several transactions—including two credit facilities that secured nondilutive financing, which was an important feature to investors.

132.    The Company's business model requires significant investment in its massive CEA facilities.

133.    The Company, as an unproven player in the CEA business and having never been profitable, had unique and idiosyncratic risks when it went public. For instance, unlike overseas competitors who utilize traditional outdoor agriculture, the Company employs domestic workers and incurs admittedly higher labor costs. The Company is also incorporated under Delaware law as a public benefit corporation, which means the Company's affairs are statutorily required under the Delaware General Corporation Law to be managed "in a manner that balances the pecuniary interests of the corporation's stockholders, the best interests of those materially affected by the

corporation's conduct, and the specific public benefit or public benefits identified in" the corporate charter.

134.    Defendants persistently touted the importance of securing financing to scale up the size of the Company's geographical footprint on favorable terms—especially that the financing be nondilutive—and the Company's ability to do so. However, Defendants also knew that financing would only materialize if the Company appeared successful and able to deliver on its novel concept. In fact, on June 9, 2021, at the Cowen Sustainability & Energy Transition Summit, Defendant Lee stated:

> I mean, you absolutely are right. I think the game changer for us is how we can fund our future. ***I think there were a lot of questions, you know, can this young company stand up a, a large, you know, multi square foot, 2.8 million square foot facility and produce, and, and that we answered***, but the big, I think perhaps surprise many on the call was that we can fund our future. So more specifically, you know, we announced that there are two important aspects to this. Both of which create, ***I think the ability for us to have less and less dilutive forms of financing for this scale build out. So, the first piece is that we announced that we were gonna closed in this quarter in Q2, a 60% loan to value bank facility at four to five percent cost of capital.***
>
> You know, there are hard, like we own this 60-acre facility with cutting edge technology, stealing glass that's producing. ***And, and I think what we're finding is our banking partners are able to, to really evaluate on, on a relatively low-risk basis, the fact that this facility is worth a significant amount of money.*** And, and so having, you know, ***a 75 million credit facility say for, Morehead, which we will close soon is a great testament to the fact that we're, we're, we're bankable, that the business model is assured*** and, and this is more important, obviously for all the facilities to come, which will benefit from being run by the same team has large company, public, uh, company experience benefit from being in the same region with the same access to the same talent, leveraging the same local government benefit of creating a new economy in West Virginia and Kentucky, and the rest of Appalachia where both sides of the aisle, frankly, are rooting for us.

135.    Reassuring lenders that the Morehead Facility was functional and scalable was important not only for development of the Morehead Facility but also for inducing financiers to extend credit with respect to the Company's additional future facilities:

*And, and I think banks are now, appreciating that, and, and showing up with real capital that we intend to close. I think the other part of it is we talked about not just, a way to have great credit facilities for the assets we own, but we could fund very competitively the development of new assets.* What's exciting for us is that we already are well underway on Richmond and Barea to Kentucky projects, uh, all along with all the others, that will be up on time by 2025. And we have access to capital that's nondilutive, that we hope to, now once, in the quarter, which we talked about in the Q call already to be able to have, you know, over a hundred million of access for just the first couple of facilities going forward. So it's, it's a different, it's a game changer because if you're thinking about assets that are producing strong return on invested capital, which we provide guidance on, we actually increase, the guidance for our ROIC [return on invested capital] expectations for each of our farms. And you have the benefit of having a levered ROIC, with access to, to nondilutive capital. I, it, it really is an exciting time, to execute against this plan. Really our job now is just to put our heads down, since we won't lack for capital and, and get it done.

136.    One way in which the Company sought to demonstrate the appearance of success to lenders was by acquiring an asset which purportedly could offset some of the Company's expensive labor costs with technology. Such a strategy obviously would, and did, act as chum to the spotlight of investor-oriented media and garner positive publicity.

137.    In April 2021, Defendants acquired Root AI—a company that develops robotics and artificial intelligence for farming applications, which the Company was already using as a vendor. Root AI's "signature robot" was a produce harvester called Virgo designed to harvest tomatoes. The total consideration paid by the Company for Root AI was $60 million, consisting of approximately $10 million in cash and 2,328,000 shares of Company common stock for the remaining balance. Thus, the Company was able to pay for Root AI mainly with the Company common stock the price of which was artificially inflated. After the transaction, Barclays, in a report dated June 16, 2021, stated the Root AI acquisition "should help to optimize yield and lower costs over time, driving higher shareholder returns."

138.    Defendants were also able to close deals on two credit facilities that the Company had lined up, but could not complete, before the Company reported Q1 2021 results. The main

reason for this delay was because lenders were waiting to see how the Company would perform in its first quarter. As Defendant Lee stated during the Q1 Earnings Call on May 17, 2021, the Company's purportedly successful operations allowed its banking partners to "evaluate" the Company's facilities as "low risk[.]" This allowed the Company to parlay its "successful" first quarter into securing two additional nondilutive credit facility agreements totaling $166 million.

139.    On June 16, 2021, the Company announced it secured a $75 million credit facility via Rabo AgriFinance LLC. The $75 million was to be used to help the Company to "fuel expansion of its rapidly growing network of high-tech" CEA facilities. Just one month later on July 23, 2021, the Company announced an additional $91 million financing agreement with Equilibrium Capital to build a new CEA facility in Richmond, Kentucky.

## DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS

140.    The Company suffered lower saleable yield, quality and prices, and higher distribution and transportation fees caused by widespread operational inefficiencies from inadequate training and an inability to reliably retain and staff the Morehead Facility due to attrition, labor churn, and the COVID-19 pandemic. In order to conceal these issues from the market, Defendants issued a series of material misstatements and omitted material facts in the Company's public filings, press releases and other documents. These material misstatements and omissions created the false impression that the Company was executing on its novel CEA concept at scale, on schedule, and in-line with previously announced expectations.

### The Company's February 1, 2021 Press Release

141.    On February 1, 2021, when the Company began trading on the NASDAQ after completion of the business combination with Novus, the Company issued a press release reporting the completion of the business combination with Novus (the "February 1 Press Release").

142.    In the February 1 Press Release, Defendants caused the Company to state that the "Company reaffirms Full-Year 2021 Guidance[,]" which was originally issued on December 15, 2021, before the Company even began its first harvest. Defendants falsely attributed the "reaffirm[ed]" guidance to the Company's purportedly strong operational performance, which at that time had already deteriorated. Defendant Lee stated: "*With our first harvest already underway and produce shipping to major grocery outlets, we reiterate our full-year 2021 guidance. Supported by early sales from its first harvest, AppHarvest reaffirms guidance on full-year 2021 net revenue of $21 million and Adjusted EBITDA of ($41) million provided during its Analyst Day presentation on December 15, 2020*."

143.    The above statements were false, misleading, and/or lacked a reasonable basis when made because such statements promoted the Company's "harvest," "shipping," and "sales" as the basis that underpinned and "supported" Defendants' decision to "reiterate" and "reaffirm[]" the Company's full-year year net revenue and Adjusted EBITDA guidance. The Company's previous guidance that was being "reiterate[d]" and "reaffirm[ed]" was created in December 2020, before the Company even began harvesting, shipping, or selling tomatoes. However, the Company's "harvest," "shipping," and "sales," all of which commenced in January 2021, were already significantly behind in production and unable to keep sufficient staffing given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)     Defendants Lee's and Eggleton's admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vi)     according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)     according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)     according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce; and

(ix)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

144.     As a result of the foregoing, Defendants' statements regarding the Company's "reiterate[d]" and "reaffirm[ed]" guidance being "supported" by the Company's "harvest," "shipping," and "sales" operations were false, misleading and/or lacked a reasonable basis. The statements were also false, misleading, and/or lacked a reasonable basis insofar as they touted the Company's "harvest," "shipping," and "sales" in an undeservedly rosy light.

*A February 1, 2021 Interview on Cheddar News*

145.    In connection with the Company's public trading, in addition to issuing the February 1 Press Release, Defendants Webb and Lee went on a blitz of interview and media appearances to promote the Company's securities.

146.    On February 1, 2021, Defendants Webb and Lee were interviewed by anchor Kristen Scholer on Cheddar News. During the interview, Defendant Webb stated:

> Scholer: So Jonathan, I want to bring you in as well because we saw some of this action first hand recently. So your first tomato harvest – just a couple of weeks ago making its way to the different grocery stores – we're talking about Walmart, Publix, Kroger, Food City among others. Your location in Central Appalachia – how is that conducive to business? Have there been any issues with the supply and the distribution of your products?

> Webb: ***Oh no, that's our advantage***… Our job right here is to keep charging and build facilities on the ground and David Lee and our Board member Martha Stewart and others are thinking through what are those – you know what are those products that we can be making with this good, healthy, ***consistent supply coming out of our facilities*** here in Central Appalachia.

147.    Defendant Webb's statements regarding the Company's purported "consistent supply" as an "advantage" and refuting "any issues" with the Company's "supply and distribution" were false, misleading, and/or lacked a reasonable basis when made because by February 1, 2021, the Company's "supply and distribution" was already significantly negatively impacted by inconsistent quality and saleable yield, and returns, given that:

> (i)    Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

> (ii)   Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(v)    according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vi)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)    according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(ix)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

***February 1, 2021 Interview on the TD Ameritrade Network***

148.    On February 1, 2021, Defendant Webb was interviewed by anchor Tom White on the TD Ameritrade Network, an over-the-top broadcast streaming channel. During the interview, Defendant Webb stated:

White: What kind of contracts do you have with distributors and stores across the country? And do you expect that to grow sequentially moving into 2022 and beyond?

Webb: …We use less land, less water, and ***we have predictable growing practices***, so we can control the environment and have a ***predictable supply year round***. It's a premium product at a conventional price. Uh, as much ***as we can build and grow, we'll, we'll be on the top 25 grocery shelves throughout the U.S***.

149.    Defendant Webb's statements above touting the Company's purported "predictable growing process" resulting in "a predictable supply," and that the Company was poised to sell "as much as we can build and grow" were false, misleading, and/or lacked a reasonable basis when made because by February 1, 2021, the Company's "growing practices" and "supply" were highly unpredictable and the Company's ability to put products on "grocery shelves" was significantly negatively impacted given that:

(i)     Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vi)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn

(according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)    according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce; and

(ix)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

**The Company's February 2, 2021 Form 8-K**

150.    Given that Novus, the Company's predecessor registrant with the SEC, was a shell company, the Company was required to file on SEC Form 8-K all of the information that would be required if the Company were filing a general form for registration of securities on SEC Form 10. Thus, the Company filed a Current Report with the SEC on Form 8-K (the "February 2 Form 8-K"), signed by Defendant Eggleton.

151.    The February 2 Form 8-K announced the completion of the business combination between the Company and Novus. The Form 8-K incorporated by reference numerous false and/or misleading statements contained in a prospectus and definitive proxy statement filed by Novus with the SEC on January 11, 2021 (the "January 11 Proxy Statement/Prospectus").

152.    With respect to the Company's "Risk Factors" (emphasis in original), the February 2 Form 8-K directed investors to the false and misleading January 11 Proxy Statement/Prospectus that stated: "***The risks associated with the Company's business are described in the Proxy Statement/Prospectus in the section entitled 'Risk Factors' beginning on page 39 of the Proxy***

*Statement/Prospectus and are incorporated herein by reference*."

153.    The January 11 Proxy Statement/Prospectus, and therefore the February 2 Form 8-K by reference, contained false, misleading, and incomplete risk disclosures with respect to investing in the Company which stated:

**Risks Related to AppHarvest**

Even if [the Company's] investments do result in the growth of its business, *if AppHarvest does not effectively manage its growth, it may not be able to execute on its business plan* and vision, respond to competitive pressures, *take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect AppHarvest's business, financial condition and results of operations.*

\*       \*       \*

*AppHarvest depends on employing a skilled local labor force, and failure to attract and retain qualified employees could negatively impact AppHarvest's business, results of operations and financial condition.*

\*       \*       \*

[…] even *if AppHarvest is able to identify, hire and train its labor force, there is no guarantee that AppHarvest will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict AppHarvest's ability to operate its greenhouses profitably, or at all.*

\*       \*       \*

*Any significant or unexpected rejection of AppHarvest's products could negatively impact AppHarvest's results of operations, and AppHarvest may be unable to sell the rejected products to other third parties.*

\*       \*       \*

*If AppHarvest's products* fail to gain market acceptance, are restricted by regulatory requirements or *have quality problems, the company may not be able to fully recover costs and expenses incurred in its operation, and its business, financial condition or results of operations could be materially and adversely affected.*

\*       \*       \*

46

***In future periods, revenue growth could slow or revenue could decline for a number of reasons, including*** slowing demand for AppHarvest's products, increasing competition, a decrease in the growth of the overall market, or ***AppHarvest's failure, for any reason, to take advantage of growth opportunities. If AppHarvest's assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if it does not address these risks successfully, AppHarvest's operating and financial results could differ materially from its expectations, and its business could suffer.***

\*       \*       \*

***The COVID-19 pandemic could negatively impact on AppHarvest's business, results of operations and financial condition.***

\*       \*       \*

[…] ***Although AppHarvest has not experienced material financial impacts due to the pandemic,*** the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact the company's business, financial condition and cash flows. Although AppHarvest's business is considered an "essential business," ***the COVID-19 pandemic could result in labor shortages, which could result in AppHarvest's inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.….The extent of COVID-19's effect on AppHarvest's operational and financial performance will depend on future developments,*** including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. ***As a result, it is not currently possible to ascertain the overall impact of COVID-19 on AppHarvest's business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact AppHarvest's business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.***

154.    The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray the Company's ability to "effectively manage its growth," "execute on its business plan," "satisfy customer requirements or maintain high quality product" offerings as contingent or potential when the Company was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer returns and costs; (b) Defendants speculate that "failure to attract and retain qualified employees could

negatively impact" the Company's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate its greenhouses profitably," when, in reality, those situations had already transpired; (c) Defendants speculate that "significant or unexpected rejection of AppHarvest products" could "negatively impact" results when the Company was already experiencing massive customer returns because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when the Company was not doing so, but rather was selling "substantially all" of its products to Mastronardi; (d) Defendants speculate that "quality problems" could "materially and adversely" affect the Company's "business, financial condition or results of operations" when they were already doing so; (e) Defendants make a boilerplate and vague disclaimer that if the Company fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (f) Defendants falsely misrepresent the Company "has not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," could negatively impact the Company's "business, results of operations and financial condition" and "cash flows," could "result in labor shortages," could cause an "inability to plant and harvest crops at full capacity," and could "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused the Company to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The falsity of Defendants' speculative, contingent, and woefully

48

incomplete statements of known risks is supported by ample evidence, given that:

(i)      Defendants admitted that for the **"*six months*"** ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "**_six months_**" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)      according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vi)     according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(ix)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

***The Company's February 10, 2021 Form S-1***

155.    On February 10, 2021, the Company filed a Registration Statement with the SEC on Form S-1 (the "February 10 Form S-1"), containing a preliminary prospectus, signed by Defendants Webb, Eggleton, and Lee.

156.    The February 10 Form S-1 contained false, misleading, and incomplete risk disclosures with respect to investing in the Company:

**Risks Related to Our Business and Industry**

Even if [the Company's] investments do result in the growth of our business, ***if we do not effectively manage our growth, we may not be able to execute on our business plan*** and vision, respond to competitive pressures, ***take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.***

\*        \*        \*

***We currently rely on a single facility for all of our operations.***

…***Adverse changes or developments affecting the Morehead Facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead Facility,*** which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, ***would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.***

\*        \*        \*

***We depend on employing a skilled local labor force, and failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.***

\*        \*        \*

even *if we are able to identify, hire and train its [sic] labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.*

\*      \*      \*

*Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.*

\*      \*      \*

*If our products* fail to gain market acceptance, are restricted by regulatory requirements or *have quality problems, the company may not be able to fully recover costs and expenses incurred in our operation, and our business, financial condition or results of operations could be materially and adversely affected.*

\*      \*      \*

*In future periods, revenue growth could slow or revenue could decline for a number of reasons, including* slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or *our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.*

\*      \*      \*

*The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.*

*Although we have not experienced material financial impacts due to the pandemic,* the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact the company's business, financial condition and cash flows. Although our business is considered an "essential business," *the COVID- 19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments,* including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. *As a result, it is not*

*currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.*

157.     The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when the Company was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer returns and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead Facility" could disrupt the Company's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" the Company's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect the Company, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when the Company was already experiencing massive customer returns because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when the Company was not doing so, but rather was selling "substantially all" of its products to Mastronardi; (e) Defendants speculate that "quality problems" could "materially

and adversely" affect the Company's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if the Company fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent the Company has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," could negatively impact the Company's "business, results of operations and financial condition" and "cash flows," could "result in labor shortages," could cause an "inability to plant and harvest crops at full capacity," and could "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused the Company to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The material falsity of Defendants' speculative, contingent, and incomplete statements of known risks is supported by ample evidence, given that:

(i)      Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield,

and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vi)     according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)     according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)     according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(ix)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

### The Company's February 25, 2021 Press Release

158.     On February 25, 2021, Defendants caused the Company to issue a press release announcing full-year 2020 financial results as well as revised guidance statements (the "February 25 Press Release"). Later that same day, the Company filed a Current Report on Form 8-K with the SEC, signed by Defendant Eggleton, attaching the February 25 Press Release as Exhibit 99.1 thereto.

159.     The February 25 Press Release raised the Company's earnings guidance compared to its most recent guidance (in the February 1 Press Release), specifically as a result the Company's operational performance, which at that time had already deteriorated. Defendants stated:

**First Quarter 2021 Outlook and Fiscal Year 2021 Forecast**

"***Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020***," said AppHarvest Founder & Chief Executive Officer Jonathan Webb. […] ***In addition to better than anticipated crop yields and pricing***, the Company has benefited from a temporary decline in market supply. […]

160.     The above statements were false, misleading, and/or lacked a reasonable basis when made because such statements touted the Company's "favorable crop yields and market pricing," and "better than anticipated crop yields and pricing" as the basis that underpinned and "support[ed]" Defendants' decision to raise the Company's full-year year net revenue and Adjusted EBITDA guidance. However, the Company's "crop yields," were not "favorable" in either quantity (due to massive undisclosed waste and spoilage) or quality, which had already caused significant deterioration to "pricing" given that:

(i)      Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(v)      according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost

sales;

(vi)     according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce; and

(ix)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

161.    And as a result of the foregoing, Defendants' statements that the Company's decision to raise guidance was "support[ed]" by the Company's "favorable crop yields market pricing" were false, misleading and/or lacked a reasonable basis. The statements were also false, misleading, and/or lacked a reasonable basis insofar as they touted the Company's "crop yields" and "pricing" in an undeservedly rosy light.

**The Company's March 1, 2021 Press Release**

162.    On March 1, 2021, Defendants caused the Company to issue a press release entitled AppHarvest Acquires Flagship Morehead, Ky. Controlled Environment Agriculture Facility (the "March 1 Press Release").

163.    The March 1 Press Release contained statements that were false, misleading, and/or lacked a reasonable basis regarding the Company's earnings guidance which Defendants raised, as compared to financial guidance contained in the February 1 Press Release, as a result the

Company's purported "harvesting." Defendants stated:

**First Quarter 2021 Outlook and Fiscal Year 2021 Forecast**

***AppHarvest raised its revenue outlook range for fiscal year 2021 on February 25, 2021, versus expectations prior to the start of harvesting. "Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020,"*** said Webb.

164.    The above statements were false, misleading, and/or lacked a reasonable basis when made because such statements touted the Company's "favorable crop yields and market pricing," as the basis that underpinned and "support[ed]" Defendants' decision to raise the Company's full-year revenue outlook range. However, the Company's "crop yields," were not "favorable" in either quantity (due to massive undisclosed waste and spoilage) or quality, which had already caused significant deterioration to "pricing" given that:

(i)      Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(v)      according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vi)     according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(ix)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

165.    And as a result of the foregoing, Defendants' statements that the Company's decision to raise guidance was "support[ed]" by the Company's "favorable crop yields market pricing" were materially false, misleading and/or lacked a reasonable basis. Furthermore, Defendants' "expectations prior to the start of harvesting" could not have been met or exceeded, thereby warranting a raised sales outlook, as those prior "expectations" preceded Defendants' "operational" and "executional" challenges. The statements were also false, misleading, and/or lacked a reasonable basis insofar as they touted the Company's "crop yields" and "pricing" in an undeservedly rosy light.

*The Company's March 2, 2021 Form S-1/A*

166.    On March 2, 2021, Defendants caused the Company to file its Amendment No. 1 to Form S-1 Registration Statement with the SEC (the "March 2 Form S-1/A"), containing a preliminary prospectus, signed by Defendants Webb and Eggleton.

167.    A subsection of the March 2 Form S-1/A titled "**Our Solution**" (emphasis in original), "*We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest. […] As a result, we believe we can staff and retain our workers with less churn*, immigration challenges *and unfilled positions* that many of our competitors face." These statements were specifically added by Defendants to the March 2 Form S-1/A, and were not contained in, for example, the January 11 Proxy Statement/Prospectus or the February 10 Form S- 1.

168.    A subsection of the March 2 Form S-1/A titled "**Our Strengths**," falsely and/or misleadingly stated in pertinent part: "*We were able to efficiently hire many employees as we opened our first facility in Morehead* and have identified talent to join our team at the facilities we are developing in Richmond and Berea." This statement was specifically added by Defendants to the March 2 Form S-1/A, and was not contained in, for example, the January 11 Proxy Statement/Prospectus or the February 10 Form S-1.

169.    The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that the Company was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that the Company was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or concealed, known facts that directly contradicted those statements; (b) hiring was not a "Strength[]" for the Company; and (c) the statements misrepresented the Company's frequent hiring as a strategic "Solution" and "Strength" rather than what it was—a known consequence of the significant amount of concealed employee attrition, turnover, and churn that the Company had experienced. Thus, the above statements misrepresented and concealed that:

59

(i)     as Defendants would later admit, for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, the Company was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    as Defendants would later admit, for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

170.    Also, the above statements were false, misleading, and/or lacked a reasonable basis when made in light of the circumstances. As of March 2, 2021, the Company was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts. It was misleading for Defendants to make the above statements, and thereby paint the Company's hiring in a rosy light, without also disclosing adverse circumstances.

171.    The March 2 Form S-1/A also contained false, misleading, and incomplete risk disclosures with respect to investing in the Company:

**<u>Risks Related to Our Business and Industry</u>**

Even if [the Company's] investments do result in the growth of our business, ***if we do not effectively manage our growth, we may not be able to execute on our business plan*** and vision, respond to competitive pressures, ***take advantage of***

*market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.*

\*        \*        \*

**We currently rely on a single facility for all of our operations.**

**Adverse changes or developments affecting the Morehead Facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead Facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**

\*        \*        \*

**We depend on employing a skilled local labor force, and failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**

even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**

\*        \*        \*

**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.**

\*        \*        \*

**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.**

\*        \*        \*

**In future periods, revenue growth could slow or revenue could decline for a**

*number of reasons, including* slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or *our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.*

*    *    *

*The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.*

*Although we have not experienced material financial impacts due to the pandemic,* the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which *could* also negatively impact our business, financial condition and cash flows.

Although our business is considered an "essential business," *the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops. […] The extent of COVID-19's effect on our operational and financial performance will depend on future developments,* including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. *As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.*

172.    The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when the Company was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer returns and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead Facility" could disrupt the Company's ability to "meet our contractual obligations and operate our business" when the Company's operations were already

deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" the Company's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train [its] labor force" and "retain" employees could potentially affect the Company, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when the Company was already experiencing massive customer returns because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when the Company was not doing so, but rather was selling "substantially all" of its products to Mastronardi; (e) Defendants speculate that "quality problems" could "materially and adversely" affect the Company's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if the Company fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent the Company has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," could negatively impact the Company's "business, results of operations and financial condition" and "cash flows," could "result in labor shortages," could cause an "inability to plant and harvest crops at full capacity," and could "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused the Company to operate severely

understaffed during the first growing and harvesting season because employees were quarantining.

The falsity of Defendants' speculative, contingent, and woefully incomplete statements of known

risks is supported by ample evidence, given that:

(i)      Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(v)      according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vi)     according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(ix)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

### The Company's March 4, 2021 Prospectus

173.   On March 4, 2021, the Company filed a Prospectus with the SEC pursuant to SEC Rule 424(b)(3) promulgated under the Securities Act of 1933 (the "March 4 Prospectus").

174.   A subsection of the March 4 Prospectus titled "**Our Solution**," "*We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest. […] As a result, we believe we can staff and retain our workers with less churn*, immigration challenges *and unfilled positions* that many of our competitors face."

175.   A subsection of the March 4 Prospectus titled "**Our Strengths**[,]" falsely and/or misleadingly stated: "*We were able to efficiently hire many employees as we opened our first facility in Morehead* and have identified talent to join our team at the facilities we are developing in Richmond and Berea."

176.   The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that the Company was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that the Company was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or concealed, known facts that directly contradicted those statements; (b) hiring was not a "Strength[]" for the Company; and (c) the statements misrepresented the Company's hiring as a strategic "Solution" and "Strength" rather than what it was—a known consequence of the significant amount of concealed employee attrition,

turnover, and churn that the Company had experienced. Thus, the above statements misrepresented and concealed that:

> (i)      as Defendants would later admit, for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, the Company was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

> (ii)     as Defendants would later admit, for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

> (iii)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

177.    As of March 4, 2021, the Company was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts. It was misleading for Defendants to make the above statements, and thereby paint the Company's hiring in a rosy light, without also disclosing adverse circumstances.

178.    The March 4 Prospectus also contained false, misleading, and incomplete risk disclosures with respect to investing in the Company:

**Risks Related to Our Business and Industry**

Even if [the Company's] investments do result in the growth of our business, ***if we do not effectively manage our growth, we may not be able to execute on our business plan*** and vision, respond to competitive pressures, ***take advantage of market opportunities, satisfy customer requirements or maintain high- quality***

*product offerings, any of which could adversely affect our business, financial condition and results of operations.*

*   *   *

*We currently rely on a single facility for all of our operations. […] Adverse changes or developments affecting the Morehead Facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead Facility,* which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, *would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.*

*   *   *

*We depend on employing a skilled local labor force, and failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.*

*   *   *

even *if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.*

*   *   *

*Any significant or unexpected rejection of our products could negatively impact our results of operations, and our may be unable to sell the rejected products to other third parties.*

*   *   *

*If our products* fail to gain market acceptance, are restricted by regulatory requirements or *have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.*

*   *   *

*In future periods, revenue growth could slow or revenue could decline for a number of reasons, including* slowing demand for our products, increasing

competition, a decrease in the growth of the overall market, or our failure, for any reason, to take advantage of growth opportunities. If our *assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.*

\*      \*      \*

*The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.*

\*      \*      \*

*Although we have not experienced material financial impacts due to the pandemic,* the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," *the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops. […] The extent of COVID-19's effect on our operational and financial performance will depend on future developments*, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. *As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.*

179.    The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when the Company was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer returns and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead Facility" could disrupt the Company's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the

Company's inability to produce USDA Grade No. 1 tomatoes; (c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" the Company's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train [its] labor force" and "retain" employees could potentially affect the Company, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when the Company was already experiencing massive customer returns because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when the Company was not doing so, but rather was selling "substantially all" of its products to Mastronardi; (e) Defendants speculate that "quality problems" could "materially and adversely" affect the Company's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if the Company fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent the Company has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," could negatively impact the Company's "business, results of operations and financial condition" and "cash flows," could "result in labor shortages," could cause an "inability to plant and harvest crops at full capacity," and could "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused the Company to operate severely understaffed

during the first growing and harvesting season because employees were quarantining. The falsity of Defendants' speculative, contingent, and woefully incomplete statements of known risks is supported by ample evidence, given that:

(i)     Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vi)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)   according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(ix)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

### The March 4, 2021 Interview with Benzinga

180.   On March 4, 2021, Defendant Lee was interviewed by Mitch Hoch and Chris Katje on a livestream viewable on the YouTube channel for Benzinga. During the interview, Defendant Lee gave an update on the Company's operations relating to the Company's "first" harvest:

> Katje: Can you talk a little bit about that first, you know, crop? So, tomatoes [are] delivered to some national grocer companies. You know, I see Walmart and Kroger listed as partners in that investor presentation. Can you talk a little bit about those partners like Walmart and Kroger, and then maybe some areas or some companies that are being targeted with the tomatoes?
>
> Lee: [...] The good news is that we've been able to partner with retailers who indicate that demand is not the problem to solve here. ***I think that every tomato that we've produced has been readily put into the market.***

181.   Defendant Lee's statement that "every tomato" the Company "produced has been readily put into the market" was false, misleading, and/or lacked a reasonable basis when made because significant quantities of tomatoes that were being "produced" ended up wasted, spoiled, or returned. Also, Defendant Lee's statement fraudulently obfuscates that significant quantities of tomatoes "put into the market" were poor quality and thus garnered poor pricing. The falsity of Defendant Lee's statement is supported by evidence:

(i)   Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)   Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production

processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(v)    according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vi)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(vii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)    according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce; and

(ix)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

### The Company's April 1, 2021 Press Release

182.    On April 1, 2021, the Company issued a press release entitled AppHarvest Announces First Harvest of Tomatoes on the Vine from High-Tech Morehead Farm Shipping to Grocery Stores (the "April 1 Press Release").

183.    In the April 1 Press Release, Defendant Webb stated: "***This harvest also has proved the team can handle the production ramp-up at our Morehead Facility*** as we are now using all grow space at the high-tech farm."

184.    Defendant Webb's statements were false, misleading, and/or lacked a reasonable basis when made because the Company's "team" had not "proved" it could "handle the production ramp-up" at the Morehead Facility. In reality, the "team" produced significant quantities of tomatoes that ended up wasted, spoiled, or returned, given that:

(i)    Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(x)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

### The Company's April 6, 2021 Form S-8

185.    On April 6, 2021, Defendants caused the Company to file a Registration Statement on Form S-8 (the "April 6 Form S-8"), signed by Defendants Webb, Eggleton, and Lee.

186.    The April 6 Form S-8 incorporated by reference all of Defendants' false and misleading statements made in the February 2 Form 8-K and the March 4 Prospectus. The April 6 Form S-8 stated:

> **The following documents filed by AppHarvest, Inc. (the "Registrant") with the Securities and Exchange Commission (the "SEC") are incorporated by reference into this Registration Statement:**
>
> **[…] (b) The Registrant's Current Reports on Form 8-K (File No. 001-39288) filed with the SEC on** February 1, 2021, **February 2, 2021** (as amended on March 2, 2021), March 2, 2021 and March 29, 2021.
>
> **(c) The Registrant's Final Prospectus filed with the SEC on March 4, 2021 pursuant to Rule 424(b) under the Securities Act relating to the Registration Statement on Form S-1, as amended (File No. 333-252964).**

187.     The statements above, incorporating by reference the February 2 Form 8-K and the

March 4 Prospectus, were false and misleading for the same reasons described above.

**The Company's May 17, 2021 Press Release**

188.     On May 17, 2021, Defendant caused the Company to issue a press release reporting

its first quarter results (the "May 17 Press Release").

189.     The May 17 Press Release's "Financial Outlook" "reiterated" the Company's full

year net sales outlook. In explaining this "reiterated" outlook, Defendant Lee highlighted the

Company's "operating and financial performance," stating:

**Financial Outlook**

***The Company reiterated its full-year 2021 outlook of net sales*** of $20 to $25
million. […]

"***We are pleased by our fast start to the year, the encouraging operating and
financial performance of our Morehead Facility and our team's ability to scale
the business*** . . .," said AppHarvest President David Lee.

190.     Defendant Lee's statements above were false, misleading, and/or lacked a

reasonable basis when made because the "operating and financial performance" was misattributed

as providing support for the Company's "Financial Outlook" when such "performance" had

already deteriorated and, due to its sever operational issues, the Company was unable to scale to

operate profitably given that:

(i)      Defendants admitted that for the "***six months***" ended June 30, 2021, i.e.,
beginning in January 2021, net sales were "adversely impacted by labor and
productivity challenges associated with the training and development of the new
workforce at the Morehead, Kentucky facility," which "resulted in lower net sales
due to lower overall No. 1-grade production yields, including the impact of higher
related distribution and shipping fees";

(ii)     Defendants admitted that for the "***six months***" ended June 30, 2021, i.e.,
beginning in January 2021, that "investments in our workforce[,]" and "production
processes "caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(x)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

***The Company's May 17, 2021 Form 10-Q***

191.    On May 17, 2021, Defendants caused the Company to file a Quarterly Report with the SEC on Form 10-Q (the "May 17 Form 10-Q"), signed by Defendant Eggleton. Also,

Defendants Webb and Eggleton signed certifications of having reviewed the May 17 Form 10-Q, as required by the Sarbanes-Oxley Act of 2002.

192.   The May 17 Form 10-Q contained false, misleading, and incomplete risk disclosures:

**Risks Related to Our Business and Industry**

[…] *Even if [the Company's] investments do result in the growth of our business, if we do not effectively manage our growth, we may not be able to execute on our business plan and vision, respond to competitive pressures, take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.*

\*        \*        \*

*We currently rely on a single facility for all of our operations.*

*Adverse changes or developments affecting the Morehead Facility could impair our ability to produce our products and our business, prospects financial condition and results of operations. Any shutdown or period o reduced production at the Morehead Facility,* which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, *would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.*

\*        \*        \*

*We depend on employing a skilled local labor force, and failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.*

\*        \*        \*

even *if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.*

\*      \*      \*

***Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.***

\*      \*      \*

***If our products*** fail to gain market acceptance, are restricted by regulatory requirements or ***have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected***

\*      \*      \*

***In future periods, revenue growth could slow or revenue could decline for a number of reasons, including*** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or ***our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.***

\*      \*      \*

***The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.***

\*      \*      \*

***Although we have not experienced material financial impacts due to the pandemic,*** the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," ***the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops....The extent of COVID-19's effect on our operational and financial performance will depend on future developments,*** including the duration, spread and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to

predict considering the rapidly evolving landscape. ***As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.***

193.    The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when the Company was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer returns and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead Facility" could disrupt the Company's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" the Company's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train [its] labor force" and "retain" employees could potentially affect the Company, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when the Company was already experiencing massive customer returns because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when the Company was not doing so, but rather was selling "substantially all" of its products to Mastronardi; (e) Defendants speculate that "quality problems" could "materially and adversely"

affect the Company's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if the Company fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent the Company has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," could negatively impact the Company's "business, results of operations and financial condition" and "cash flows," could "result in labor shortages," could cause an "inability to plant and harvest crops at full capacity," and could "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused the Company to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The falsity of Defendants' speculative, contingent, and woefully incomplete statements of known risks is supported by ample evidence, given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)     Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)     according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)     according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)     according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)     according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(x)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

194.     Also, the May 17 Form 10-Q's "Results of Operations" section gave a false and misleading presentation of the Company's net sales when making its "Comparison of the Three Months Ended March 31, 2021 and 2020." The May 17 Form 10-Q stated:

> ***The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified.***

*Net Sales*

***Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility.***

195.    The above statements were misleading when made because Defendants discussed the "changes" in net sales while failing to state, so as not to mislead, known changes affecting net sales with respect to the Company's operations. Defendants admitted in the 2Q Form 10-Q that for the "six months" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees." Thus, Defendants' failure to disclose this information in the May 17 Form 10-Q was misleading or lacked a reasonable basis. Also, Defendants' material omission violated Item 303 of SEC Regulation S-K which obligated them to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales . . . from continuing operations."

**The Company's May 17, 2021 Earnings Call**

196.    On May 17, 2021, Defendants Webb, Eggleton, Lee and other Company executives held the Q1 Earnings Call with analysts to discuss the Company's first quarter fiscal 2021 quarter results, a recording of which was thereafter uploaded to the Investor Relations page of the Company's website.

197.    During the question-and-answer portion of the Q1 Earnings Call, analysts were acutely interested in the quality of the crops that the Company was able to harvest in order to get a sense of the pricing that the Company was able to command. The very first question sought

clarity "on the price side." Defendant Lee falsely and/or misleadingly claimed that the Company's operations "performed" in such a way that they were: (i) responsible for the Company's purportedly strong "market pricing" in the quarter and (ii) the reason that the Company was able to affirm its previously disclosed full-year 2021 net sales guidance—while failing to disclose the operational problems that were plaguing the Company's product quality, and thus, its pricing. Defendant Lee stated, in pertinent part:

> **Jeffrey David Osborne**
> Cowen and Company, LLC, Research Division
>
> Congratulations on your first earnings call as a public company. Just a couple of questions on my end. One, I was wondering if we could get going on the pricing dynamics that you alluded to. How much of that was due to quality of the output, so non-grade 1 versus just broader market conditions. I thought, historically, the winter months had seasonally higher prices relative to the summer. So I'm just trying to get a sense of what the moving pieces are on the price side.
>
> **David J. Lee**
> President & Director
>
> ***What we did well is we anticipated and performed well on -- in market pricing.*** A big part of that in Q1 was our relationship with Mastronardi. […] And ***our affirmation of our guidance in 2021 reflects that we think we're on track.***

198.     The above statements were false, misleading, and/or lacked a reasonable basis when made because the Company was not providing "quality" tomatoes to its customers, and therefore and "pricing" was not "performed well on" given that:

(i)      Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce; and

(x)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

199.    Also, the statements were false, misleading, and/or lacked a reasonable basis when made because Defendant Lee touted the Company's "pricing," which had deteriorated for the reasons above, as the basis that underpinned Defendants' "affirmation of our guidance in 2021."

*A May 17, 2021 Interview with Cheddar News*

200.    On May 17, 2021, after releasing the Company's quarterly earnings materials, Defendant Webb participated in a series of interviews with financial news media outlets, including an interview by anchor Brad Smith on Cheddar News. During the interview, when questioned about the Company's first quarter operational performance, and the Company's outlook, Defendant Webb stated:

> Smith: [W]hen you think about what the key performance indicators that you are tracking across the business are, what would you look towards for the rest of 2021 to prove that this has been a successful year and taking some of that momentum into 2022 as well?
>
> Webb: Well, we, *we hired nearly 500 people, uh, in the middle of a global pandemic. And so our operating team in Morehead, uh, for our first facility, those financial projections virtually didn't change much at all.*

201.    Defendant Webb's statements were false, misleading, and/or lacked a reasonable basis when made because the Company's efforts to train and staff the Morehead Facility's "operating team" were unsuccessful and did not support or validate the Company's financial projections, given that:

> (i)     Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";
>
> (ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;
>
> (iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)     Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)      Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)     according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)     according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce; and

(x)      according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

***The May 17, 2021 Interview On Yahoo! Finance Live***

202.    On May 17, 2021, Defendant Webb was interviewed on Yahoo! Finance Live by Myles Udland and Julie Hyman.

203.    During the interview, Defendant Webb was asked whether the Company had "struggled" with its "labor." In response, Defendant Webb denied that the Company had experienced adversity. Defendant Webb stated:

Udland: You know, Jonathan kind of coming back down from the, from the high level overview here – which I think is, is a thesis a lot of people can get behind – you know, we're showing the VO of the, the facility build-out that you guys have done. All we hear about are supply bottlenecks, the inability to get the labor needed to get projects off the ground. Have you guys struggled with that as-- at all, as you're trying to build, you know, two more facilities to be done by the end of next year?

Webb: So we, we will have, this year, four more facilities under construction in total – plan on launching at least five into operations next year, including the, the current operating asset. And, and very proud of this region. You know, Eastern Kentucky that's been known for powering the country in the coal industry. We, *we built this first facility in the middle of a global pandemic, and we stood up the facility, uh, and have 500 people working with us now*, uh, and, and had record ice storms in February and *virtually no impact to operation*.

204.    Defendant Webb's statements were false, misleading, and/or lacked a reasonable basis when made because the Company's efforts to staff the Morehead Facility caused significant adverse "impact" for the Company's "operation," given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield,

and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)   according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)   according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)   according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(x)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

***A May 25, 2021 Interview By Stephens Inc.***

205.   On May 25, 2021, Defendant Lee attended the Food & Ag Disrupted Conference hosted by investment bank Stephens Inc. During the conference, Defendant Lee participated in a videorecorded interview taken by analyst Mark Connelly.

206.   During the interview, Defendant Lee was asked about the Company's performance and "what sort of a learning curve" the Company could expect, if any (i.e., Defendant Lee was asked to provide detail regarding any operational inefficiencies that existed in the first quarter). Defendant Lee concealed that the Company's significant operational challenges—shifting attention solely to certain well-publicized ice storms—and falsely claimed that the Company's

purported success, both operationally and from a staffing/labor perspective, were "validation" that the Company could "execute well" and supported Defendants' decision to reaffirm the Company's full-year 2021 financial guidance. Defendant Lee stated:

> Mark Connelly: Right. Now, you sold your first crop in January. Um, can you talk about how that startup went and what sort of a learning curve we should be thinking about in terms of optimizing production across the whole facility?

> David Lee: Yeah, I mean, in, in many ways, there were critics who thought, how can this company who was pre-revenue, pre-farm a year ago, stand up a farm and produce, you know, millions of pounds of product. And so, the lessons were really valuable for us. ***One was validation and proof that we could do what we say, you know, being able to hit the expectations***, to deliver 2.3 million of net revenue and, and to be at the better end of our negative adjusted EBITDA range was important. ***So that was a lesson for the corporate center, but in terms of the farm***, you know, there was incredibly, challenging set of conditions throughout the country in Q1. You probably read about the ice storms that gripped parts of the country. And ***our facility at Morehead proved that it could weather those conditions maybe better than most. We, we learned about what kind of labor we could source locally having, um, 500 plus employees ready to, to join us, if we want, proved and validated the model that we really could hire local talent, give them a living wage, provide full-time employees stock and execute well*** within, actually, the adjusted EBITDA range that we expected. So that was an important lesson. ***I think the other lesson is we learned that we could hit our numbers and still experiment*** and trial a way to optimize what we call Morehead 2.0—this is on the other side of our summer refresh—so that we have more confidence in our ability to produce better in the future. ***And it's the reason why we affirmed the expectations we had put out for the year.***

207.     Defendant Lee also denied that the Company experienced any staffing inefficiencies, including as a result of the Covid-19 pandemic:

> Mark Connelly: Okay. I've, I've got a couple, a couple of I think they're COVID related questions. So I want to try, try to put them together here. COVID has hit a rural areas hard lately. AppHarvest doesn't seem to have been too impacted. Can you talk about whether COVID has affected your design and construction timing, and then there's a second question about the ability to get labor, uh, in your plant. We've, we've had a number of companies in, in the, in the food business tell us that they can't get a full second shift.

> David Lee: Oh, okay. Well, let's cover both. Um, ***thankfully COVID has not in any way impacted our operation***… With regard to labor, we have had absolutely no shortage of interest. I mean multiples of the amount of roles that we wanna fill,

have lined up to work with us. And, and a part of that is by design, a part of that is the kind of company we want to be and the part of the country in which we choose to produce. ***So we haven't had any challenges with recruiting or staffing.***

208.    Defendant Lee's statements above were false, misleading, and/or lacked a reasonable basis when made when made given that:

(i)    Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns— existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to

the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)   according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground to be saleable, contributing to at least 5-10% of wasted produce;

(x)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

### *May 26, 2021 Industry Focus Interview*

209.   On May 26, 2021, Defendant Webb was interviewed by host Jason Moser on a segment of the Industry Focus podcast called Wildcard Wednesday. The Industry Focus podcast is presented by The Motley Fool, a popular investing news website.

210.   During the interview, Defendant Webb was asked about the Company's performance and to describe "some of the highlights" of the Company's first quarter. Defendant Webb concealed that the Company's significant operational challenges—shifting attention solely to certain well-publicized ice storms—and falsely and/or misleadingly represented that the Company's significantly challenged production "capacity" as running "full" and having "no issues." Defendant Webb stated:

> Moser: Yeah. Well, I mean, speaking of publicly traded company, you just, you just released your first quarter results, and I think this was your first full quarter as a publicly traded company. I'm sure it was an exciting time. I just wonder if you could share some of the highlights, some of the things you're proud of in regard to this, to this earnings release and, and your excitement here for the year to come.

> Webb: …We're ramping up this first facility in the middle of a global pandemic. We had an ice storm if people remember that ice storm back in February. ***Our facility operated at full, you know, ramping up into full capacity with no issues in the middle of a global pandemic in the middle of an ice storm.***

211.    Defendant Webb's statements were false, misleading, and/or lacked a reasonable

basis when made when made given that:

(i)     Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)   according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)   according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground from being saleable, contributing to at least 5-10% of wasted produce;

(x)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

### June 3, 2021 Interview With Seeking Alpha

212.   On June 3, 2021, Defendant Webb was interviewed by Rena Sherbill. During the

interview, when questioned about the Company's human resources, Defendant Webb stated:

Sherbill: [I]n terms of the human labor force, because as you mentioned, you know, working with robotics, working with AI, how does the labor structure work? Do you have, uh data scientists working on that? Do you have agriculture, you know, people coming from the agricultural field? How does that work in terms of the labor structure?

Webb: We're at about 550 employees right now. We'll be at roughly a thousand employees this time next year. And as we scale that team, out of real self preservation, we need to be developing talent internally. Uh, and, and I see, we see that as a huge opportunity for us to *not only retain employees*, but recruit employees. We've had, uh, nearly 8,000 people apply to work at AppHarvest this year, um, number might be up to 10,000 now. *And again, in this time where you, you read in the news about labor shortages, you read in the news about, uh, people having issues of people showing up to work. We hired 500 employees in the middle of COVID, uh, and they're showing up every day.*

213.   Defendant Webb's statements were false, misleading, and or lacked a reasonable

basis when made because the Company suffered significant challenges "retain[ing]" employees,

and employees were not "showing up every day" given that:

(i)   Defendants admitted that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, the Company was "adversely impacted" by "labor" challenges;

(ii)   according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons,

including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic.

***The Company's June 4, 2021 Form S-1***

214.    On June 4, 2021, Defendants caused the Company to file a Post-Effective Amendment No. 1 to Form S-1 Registration Statement with the SEC (the "June 4 Form S-1"), containing a preliminary prospectus, signed by Defendants Webb, Eggleton, and Lee.

215.    A subsection of the June 4 Form S-1 titled "Our Solution": "***We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest…As a result, we believe we can staff and retain our workers with less churn***, immigration challenges ***and unfilled positions*** that many of our competitors face."

216.    A subsection of the June 4 Form S-1 titled "Our Strengths[,]" falsely and/or misleadingly stated: "***We were able to efficiently hire many employees as we opened our first facility in Morehead*** and have identified talent to join our team at the facilities we are developing in Richmond and Berea."

217.    The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that the Company was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that the Company was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or concealed, known facts that directly contradicted those statements; (b) hiring was not a "Strength[]" for the Company; and (c) the statements misrepresented the Company's hiring as a strategic "Solution" and "Strength" rather than what it was—a known consequence of the significant amount of concealed employee attrition,

turnover, and churn that the Company had experienced. Thus, the above statements misrepresented and concealed that:

(i)     as Defendants would later admit, for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, the Company was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    as Defendants would later admit, for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols"; and

(iv)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

218.    As of June 4, 2021, the Company was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts. It was misleading for Defendants to make the above statements, and thereby paint the Company's hiring in an undeservedly rosy light, without also disclosing adverse circumstances.

219.   The June 4 Form S-1 also contained false and misleading risk disclosures with respect to investing in the Company which stated:

**Risks Related to Our Business and Industry**

Even if [the Company's] investments do result in the growth of our business, *if we do not effectively manage our growth, we may not be able to execute on our business plan* and vision, respond to competitive pressures, *take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.*

\*     \*     \*

*We currently rely on a single facility for all of our operation*

*Adverse changes or developments affecting the Morehead Facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead Facility*, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, *would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.*

\*     \*     \*

*We depend on employing a skilled local labor force, and failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition even if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.*

\*     \*     \*

*Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.*

\*     \*     \*

*If our products* fail to gain market acceptance, are restricted by regulatory requirements or *have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.*

\*     \*     \*

*In future periods, revenue growth could slow or revenue could decline for a number of reasons, including* slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or *our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.*

\*     \*     \*

*The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.[…] …Although we have not experienced material financial impacts due to the pandemic,* the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," *the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments,* including the duration, spread and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. *As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.*

220.    The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when the Company was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer returns and

costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of

"reduced production at the Morehead Facility" could disrupt the Company's ability to "meet our

contractual obligations and operate our business" when the Company's operations were already

deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c)

Defendants speculate that "failure to attract and retain qualified employees could negatively

impact" the Company's business when the Company was already suffering massive attrition, and

Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the

Company's potential inability to "train our labor force" and "retain" employees could potentially

affect the Company, including its "ability to operate our greenhouses profitably," when, in reality,

those situations had already transpired; (d) Defendants speculate that "significant or unexpected

rejection of our products" could "negatively impact" results when the Company was already

experiencing massive customer returns because of poor quality that eroded sales and inflated costs,

and Defendants speculate further that the Company may not be able to resell rejected products to

"other third parties" when the Company was not doing so, but rather was selling "substantially all"

of its products to Mastronardi; (e) Defendants speculate that "quality problems" could "materially

and adversely" affect the Company's "business, financial condition or results of operations" when

they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if the

Company fails to "take advantage of growth opportunities" "for any reason" it might see declining

revenue, when Defendants were already experiencing wide-ranging execution problems for the

entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent

the Company has "not experienced material financial impacts due to the pandemic" and speculate

that the COVID-19 pandemic, due to contingent and vague "future developments," could

negatively impact the Company's "business, results of operations and financial condition" and

"cash flows," could "result in labor shortages," could cause an "inability to plant and harvest crops at full capacity," and could "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused the Company to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The falsity of Defendants' incomplete statements of known risks is supported by the following:

(i)      Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)     Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)      Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)     according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons,

including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)    according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground from being saleable, contributing to at least 5-10% of wasted produce;

(x)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

221.    The June 4 Form S-1's "Results of Operations" section also gave a false and misleading presentation of the Company's net sales when making its "Comparison of the Three Months Ended March 31, 2021 and 2020." The June 4 Form S-1 stated:

*The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified.*

*Net Sales*

*Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility.*

222.    The above statements were misleading when made because Defendants discussed the "changes" in net sales while failing to state known changes affecting net sales with respect to the Company's operations. Defendants admitted in the 2Q Form 10-Q that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees."

*The Company's June 9, 2021 Prospectus*

223.    On June 9, 2021, Defendants caused the Company to file a Prospectus with the SEC pursuant to SEC Rule 424(b)(3) (the "June 9 Prospectus").

224.    A subsection of the June 9 Prospectus entitled "**Our Solution**": "*We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest. […] As a result, we believe we can staff and retain our workers with less churn*, immigration challenges *and unfilled positions* that many of our competitors face."

225.    Relatedly, a subsection of the June 9 Prospectus titled "**Our Strengths**[,]" falsely and/or misleadingly stated in pertinent part: "*We were able to efficiently hire many employees as we opened our first facility in Morehead* and have identified talent to join our team at the facilities we are developing in Richmond and Berea."

226.    The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that the Company was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that the Company was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or concealed, known facts that directly contradicted those statements; (b) hiring was not a "Strength[]" for the Company; and (c) the statements misrepresented the Company's hiring as a strategic "Solution" and "Strength" rather than what it was—a known consequence of the significant amount of concealed employee attrition, turnover, and churn that the Company had experienced. Thus, the above statements misrepresented that:

(i)      as Defendants would later admit, for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, the Company was "adversely impacted" by "labor"

101

challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     as Defendants would later admit, for the "six months" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)     Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)     according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

227.     The above statements were also false and misleading because as of June 9, 2021, the Company was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts.

228.     The June 9 Prospectus contained false and misleading risk disclosures with respect to investing in the Company:

**Risks Related to Our Business and Industry**

Even if [the Company's] investments do result in the growth of our business, ***if we do not effectively manage our growth, we may not be able to execute on our business plan*** and vision, respond to competitive pressures, ***take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.***

\*       \*       \*

*We currently rely on a single facility for all of our operations.*

*Adverse changes or developments affecting the Morehead Facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead Facility,* which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, *would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.*

\*       \*       \*

*We depend on employing a skilled local labor force, and failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition even if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.*

\*       \*       \*

*Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.*

\*       \*       \*

*If our products* fail to gain market acceptance, are restricted by regulatory requirements or *have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.*

\*       \*       \*

*In future periods, revenue growth could slow or revenue could decline for a number of reasons, including* slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or *our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial*

*results could differ materially from our expectations, and our business could suffer.*

*   *   *

**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.**

**Although we have not experienced material financial impacts due to the pandemic,** the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows.

Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crop. […] The extent of COVID-19's effect on our operational and financial performance will depend on future developments,** including the duration, spread and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business.**

**However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.**

229.    The above statements were false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when the Company was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer returns and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead Facility" could disrupt the Company's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c)

Defendants speculate that "failure to attract and retain qualified employees could negatively impact" the Company's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train our labor force" and "retain" employees could potentially affect the Company, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when the Company was already experiencing massive customer returns because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when the Company was not doing so, but rather was selling "substantially all" of its products to Mastronardi; (e) Defendants speculate that "quality problems" could "materially and adversely" affect the Company's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if the Company fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent the Company has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," could negatively impact the Company's "business, results of operations and financial condition" and "cash flows," could "result in labor shortages," could cause an "inability to plant and harvest crops at full capacity," and could "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused the Company to operate severely understaffed during the first growing and harvesting season because employees were quarantining.

The falsity of Defendants' incomplete statements of known risks is supported by evidence given that:

(i)      Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "***six months***" ended June 30, 2021, i.e., beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures regarding "labor" and employee "training" issues in 2Q 2021, including Webb's statement on the Q2 Earnings Call admitting the Company's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)     Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)      Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of returns—existed for the "initial growing season" and the "full season of harvest as a Company";'

(vi)     according to CW1, the Company did not offer employees adequate (if any) training, resulting in 5-10% of crops being wasted or damaged, and resulting in lost sales;

(vii)    according to CW1 and CW2, the Company suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including: (a) dissatisfaction with mandatory expanded working hours— including forced overtime, Saturdays, and holidays, and (b) infection and quarantining due to the COVID-19 pandemic, all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes;

(viii)   according to CW1 and CW2, the Company's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)   according to CW1, the Company's Greenhouse accumulated unsanitary decomposing plant matter that prevented any tomato that touched the ground from being saleable, contributing to at least 5-10% of wasted produce;

(x)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable.

230.   The June 9 Prospectus's "Results of Operations" section gave a false and misleading presentation of the Company's net sales when making its "Comparison of the Three Months Ended March 31, 2021 and 2020." The June 4 Form S-1 stated:

> *The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified.*
>
> *Net Sales*
>
> *Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility.*

231.   The above statements were misleading when made because Defendants discussed the "changes" in net sales while failing to state, so as not to mislead, known changes affecting net sales with respect to the Company's operations. Defendants admitted in the 2Q Form 10-Q that for the "*six months*" ended June 30, 2021, i.e., beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees." Defendants' failure to disclose this information in the May 17 Form 10-Q was misleading or lacked a reasonable basis.

**THE TRUTH IS REVEALED**

232.     On August 11, 2021, the Company shocked the market when it issued its earnings release for the Company's second fiscal 2021 quarter (the "2021 Q2 Earnings Release"). Defendants announced that the Company had been plagued by "operational ramp-up challenges," resulting from undisclosed problems affecting the Company's growing and harvesting operations and labor reliability. Such "operational ramp-up challenges" devastated the Company's tomato quality, pricing, and yields—particularly with respect to USDA Grade No. 1 tomatoes—and therefore depressed sales while simultaneously driving distribution and shipping expense incurred as a result of returns.

233.     Defendants disclosed the following financial results in the 2021 Q2 Earnings Release:

**Second Quarter 2021 Results**

For the second quarter of 2021, net sales were $3.1 million, an increase of $0.8 million from the first quarter of 2021, when AppHarvest began its inaugural harvest and launched as a public company. AppHarvest sold 8.6 million pounds of tomatoes in the second quarter, an increase of 4.8 million pounds from the first quarter.

The company recorded a net loss of $32.0 million and non-GAAP Adjusted EBITDA loss of $22.6 million in the second quarter of 2021, as compared to a net loss and non-GAAP Adjusted EBITDA loss of $1.6 million in the second quarter of 2020, when the company was still pre-production…***Second quarter 2021 results were adversely impacted by operational headwinds with the ramp up to full production at the company's first CEA facility, including labor and productivity challenges related to the training and development of the new workforce and historically low market prices for tomatoes during the second quarter of 2021 based on USDA reports. Labor and productivity challenges resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher distribution and shipping fees.***

234.     As a result of these poor results, the Company lowered its full-year 2021 net sales guidance to a range of $7 million to $9 million, from a previous range of $20 million to $25 million, and lowered its full-year 2021 EBITDA guidance to a range of a loss of $70 million to $75 million

from a prior range of a loss of $48 million to $52 million. The 2021 Q2 Earnings Release explained, in pertinent part:

**Financial Outlook**

The company adjusted its full-year 2021 net sales outlook to the range of $7 million to $9 million from a prior range of $20 million to $25 million. ***This reflects aforementioned operational headwinds associated with the full ramp up of the Morehead farm and moderated produce market price expectations and a strategic decision to broaden its business model by investing in*** farm operations technology, ***operational best practices*** and value-added products. The company also updated its full-year 2021 outlook for Adjusted EBITDA to the range of a loss of $70 million to $75 million from a prior range of a loss of $48 million to $52 million, ***driven primarily by operational challenges encountered in the abbreviated initial growing season*** and the decision to dedicate a portion of the farm to the noted strategic investments.

235.    Moreover, the Company's "operational headwinds" caused it to change its assumptions underpinning its long-term footprint guidance with respect to the number of CEA facilities that would be constructed, and therefore operate, by 2025. While claiming that the revised estimate was part of an effort to be "more conservative," the Company disclosed that its new guidance was for the Company to complete construction of nine CEA facilities by 2025, rather than twelve as previously touted to investors. The 2021 Q2 Earnings Release stated:

While the company remains on track with the plan to develop 12 farms by the end of 2025, the long-term outlook now includes more conservative assumptions based on nine CEA facilities in Appalachia. In terms of the outlook, the company will provide guidance on a conservative delivery of nine high-tech indoor farms in Appalachia by the end of 2025 while it continues to work toward a network of 12 farms by 2025.

236.    On August 11, 2021, the Company published its Quarterly Report for the quarter ended June 30, 2021 with the SEC on Form 10-Q (the "2Q2021 Form 10-Q"), which was signed by Defendant Eggleton. The 2Q2021 Form revealed that the Company's "productivity challenges" had existed for the "***six months***" ended June 30, 2021.

237.   Defendants differentiated in the same sentence of the 2Q2021 Form 10-Q between "productivity challenges" and "low market prices for tomatoes." Whereas "low market prices" purportedly affected net sales only for "three months," Defendants admitted that "productivity challenges" were different in that they eroded net sales for "six months." The 2Q2021 Form 10-Q stated:

**Net Sales**

Net sales for the three and six months ended June 30, 2021 were $3.1 million and $5.4 million, respectively, compared to $0 for the comparable prior year periods, with the increase due to the sale of tomatoes produced in the abbreviated first planting season at our Morehead CEA facility. Net sales for the three and ***six months ended June 30, 2021*** were adversely impacted by ***labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility***, and net sales for the three months ended June 30, 2021 were adversely impacted by low market prices for tomatoes. The labor and productivity challenges resulted in lower net sales due to ***lower overall No. 1- grade production yields, including the impact of higher related distribution and shipping fees.***

**Cost of Goods Sold**

Cost of goods sold for the three and ***six months ended*** June 30, 2021 was $15.7 million and $22.5 million, respectively, compared to $0 for the comparable prior year periods. Cost of goods sold was impacted by ***investments in our workforce as we develop skills needed in an industry that is new to the Appalachian region and investments in our production processes as we capitalize on operational insights from our first growing season***, as well as costs associated with the early conclusion of the first planting season at our Morehead CEA facility.

238.   On August 11, 2021, certain Defendants held the Q2 Earnings Call with analysts to discuss the Company's Q2 2021 quarter results. In advance of, or in connection with the Q2 Earnings Call, the Company published a slide deck called the "Q2 2021 Earnings Presentation" on the Investor Relations page of the Company's website. The Q2 2021 Earnings Presentation included a slide containing a "Q2 2021 Operations Update" which disclosed "[o]perational issues in first growing season[]."

239. The "Q2 2021 Operations Update" slide further disclosed the following problems which "significantly impacted revenue":



240. The Company's description of "re-pack and re-sort costs" that were "much higher than expected" is an explicit admission that the Company suffered from returns, as the Company was required to bear all costs associated with returns pursuant to the Mastronardi Morehead Agreement.

241. During the Q2 Earnings Call, Defendants further admitted that the Company's poor Q2 2021 performance was caused by an untrained and unreliable labor force at the Morehead Facility which negatively affected product quality (i.e., fewer USDA Grade No. 1 tomatoes) and reduced sales to Mastronardi. Defendant Webb stated:

> Now let me turn to our second quarter performance. While true that prices for TOV [Tomatoes on the Vine] and Beefsteak tomatoes hit a 10-year low in May, *our realized price was also impacted by quality. Our percent of store shelf-ready produce, what we call #1s, came in lower than we expected*. While disappointing, we launched a set of actions to improve our performance immediately, and we're using these key lessons for our operators going forward with the AppHarvest 2.0 initiative, which David will discuss in greater detail.

242.    Defendant Lee further explained inadequate "labor training" and "productivity challenges" were the "primary driver" of the Company's "disappointing" Q2 results and guidance reduction, and that Defendants had known about these issues as they had already implemented remedial measures, stating:

> We achieved several significant milestones at our first facility. But as Jonathan mentioned, ***lower quality than we anticipated due to labor training and productivity challenges was the primary driver of our Q2 results, along with low market prices for tomatoes.*** We're disappointed with these results, but the good news is that prevailing market prices for tomatoes have already rebounded from the lows we experienced in the second quarter.
>
> Additionally, the speed bumps associated with our initial harvest are fixable, and we've already deployed solutions against these problems in advance of our next harvest. For example, we overhauled our pack house to minimize bottlenecks while increasing quality checks, which helps us deliver our targeted volume of USDA grade #1 tomatoes. We're also implementing changes to our piece rate or bonus system to drive improvements in our operational productivity and ability to meet surges in demand for plant care. And lastly, we changed operational leadership and the chain of command structure within Morehead and all our future farms going forward. As of late July, I am now directly accountable for the performance inside our high-tech farms.

243.    Defendant Lee also disclosed that Defendants' previous statements concerning the Company's financial outlook had been reported less "conservatively" and that, as a result, Defendants had "revised expectations on price, yield and distribution costs" related to the Company's CEA operations, and further that the Company was revising its guidance with respect to the size of its footprint—down from twelve facilities by 2025 to nine facilities. Defendant Lee specifically assigned Defendants' new "conservative" assumptions regarding the operational performance of the Company's CEA business as the driver of both the Company's reduced sales guidance and its reduced footprint. Defendant Lee stated:

> Let me now turn to our 2021 guidance and long-term outlook, which reflects updates from our first full quarter production and our plan to pursue faster growth in CEA through a decentralized structure. ***It also represents what we believe to be a significant reduction in risk regarding our outlook as we've incorporated more***

112

*conservative assumptions regarding our core AppalachiaCo business*, while leveraging a distinct management team to pursue upside from technology.

For 2021, we've adjusted our full year net sales outlook to $7 million to $9 million from $20 million to $25 million to reflect our revised expectations on price, yield and distribution costs that we expect to achieve in our first year of operations. *Most of the revision is driven by the quality challenges we experienced in ramping up I discussed earlier.* However, lower-than-expected market pricing for tomatoes and our strategic decision to reserve production space at Morehead to develop commercial technology for the CEA industry at large have also impacted the numbers.

The adjusted EBITDA outlook in 2021, associated with our operational performance to date and strategic investments, is now expected to be minus $70 million to $75 million from minus $48 million to $52 million prior. While disappointing, our near-term adjusted EBITDA outlook has never been reflective of the long-term value we expect to create.

\*      \*      \*

In terms of the outlook, we are providing guidance based on *a more conservative* delivery of 9 high-tech indoor farms in Appalachia by the end of 2025.

We are still on track with the full 12 by 25 plan for our Appalachian farm network that we previously discussed, and our long-range plan continues to call for 12. But for the purposes of issuing financial guidance, we are limiting our operational focus to 9, in order to accelerate delivery of our targeted results and *reduce operational and financial risk.*

244.    Defendant Eggleton also confirmed that the Company's Q2 results and guidance reduction were primarily driven by operational and productivity issues plaguing the Company's crop harvest, stating:

Despite the speed bumps and ramping up with our initial harvest, we remain confident we are on the right path, and our business model will continue to develop into an industry standard for CEA. We believe this because our performance in the quarter was principally due to lower quality, driven by solvable issues related to labor productivity, training as well as lower market prices for tomatoes and higher distribution and shipping fees and not any fundamental -- with our business model or approach.

\*      \*      \*

113

Turning now to our full year 2021 outlook. As David mentioned, we are reducing our net sales expectation to a range from $7 million to $9 million, and our adjusted EBITDA loss expectation to a range from $70 million to $75 million. ***The primary driver of the updated outlook is the lower net sales expectation, due to the quality challenges we encountered in ramping up our first facility and higher-than expected cost of goods sold with labor farm costs, associated with lower-than expected labor productivity.***

245.    On this news, the Company's common stock price fell $3.46 per share, or approximately 29%, from $11.97 per share at market close on August 10, 2021, to $8.51 per share at market close on August 11, 2021.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

246.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

247.    AppHarvest is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

248.    Plaintiff is a current shareholder of AppHarvest and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

249.    A pre-suit demand on the Board of AppHarvest is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Webb, Lee, Bhatraju, Burnham, Couch, Mason, Stewart, and Rochester. At the time this action was filed, Non-Parties Halfmann and Willis also served on the Board. Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants. Plaintiff did not make any demand on the Board to

institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

250.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

251.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and thus, could not fairly and fully prosecute such a suit even if they instituted it.

252.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

253.    The Director Defendants have also demonstrated that demand would be futile by failing to take any action to compel Defendant Ubben disgorge any of the $49.5 million in proceeds he garnered from the June 10, 2021 sale of 3,000,000 shares of AppHarvest common stock based on his possession of non-public, undisclosed adverse information concerning the problems with the Company's workforce and the negative impact of those labor issues on AppHarvest's profitability.

254.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the

Company.

### *Defendant Webb*

255.    Because of his CEO and Board position with the Company, Defendant Webb is not independent.

256.    Defendant Webb was responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on.

257.    Defendant Webb is not independent from Defendants Bhatraju, Mason and Stewart, because they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO (Defendant Webb). Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Webb could not consider a demand adverse to the members of the Compensation Committee as they are responsible for his financial future.

258.    Defendant Webb is also a Defendant in the Securities Class Action and faces a substantial likelihood of liability; therefore, demand on Defendant Webb is futile.

### *Defendant Lee*

259.    Because of his President and Board position with the Company, Defendant Lee is not independent.

260.    Defendant Lee was responsible for the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on.

261.    Defendant Lee is not independent from Defendants Bhatraju, Mason and Stewart, because they comprise the Compensation Committee and are responsible for evaluating and

determining the compensation of the President (Defendant Lee). Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Lee could not consider a demand adverse to the members of the Compensation Committee as they are responsible for his financial future.

262.    Defendant Lee is also a Defendant in the Securities Class Action and faces a substantial likelihood of liability; therefore, demand on Defendant Lee is futile.

**Defendant Rochester**

263.    Rochester served as the Chief Marketing Officer of the Company from August 2020 to April 2021, and as a consultant of the Company from July 2019 to August 2020 and from April 2021 to September 2021.

264.    Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Rochester could not consider a demand adverse to the members of the Compensation Committee as they are responsible for his financial future.

**Defendants Burnham and Couch**

265.    Defendants Burnham and Couch served as members of the Audit Committee. Pursuant to the Audit Committee Charter, Defendants Burnham and Couch were responsible for, among other things, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management, including legal and regulatory compliance, that may affect the Company's financial reporting. Defendants Burnham and Couch failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter and to issue false and misleading financial statements with the SEC. Defendants Burnham and Couch, therefore, breached their fiduciary duties, are not disinterested, and demand is excused as to them.

## COUNT I

**Against Defendants Webb, Lee and Eggleton For Violations of § 10(b)
of the Exchange Act and Rule 10b-5**

266.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

267.    Defendants Webb, Lee, and Eggleton violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

268.    Defendants Webb, Lee, and Eggleton, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

269.    Defendants Webb, Lee, and Eggleton violated §10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of AppHarvest common stock.

270.    Defendants Webb, Lee, and Eggleton acted with scienter because they (a) knew that the public documents and statements issued or disseminated in the name of AppHarvest were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

271.    Defendants Webb, Lee, and Eggleton, by virtue of their receipt of information reflecting the true facts of View, their control over, and/or receipt and/or modification of AppHarvest's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning AppHarvest, participated in the fraudulent scheme alleged herein.

272.    As a result of the foregoing, the market price of AppHarvest common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of AppHarvest common stock in purchasing AppHarvest common stock at prices that were artificially inflated as a result of these false and misleading statements.

273.    As a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. In addition, as a consequence of their breach of fiduciary duties, the Individual Defendants have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

### Against The Director Defendants For Breach Of Fiduciary Duty

274.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

275.    The Director Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

276.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

277.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

278.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.

279.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company. As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against Defendant Ubben For Unjust Enrichment

280.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

281.     By his wrongful acts, Defendant Ubben was unjustly enriched at the expense of and to the detriment of AppHarvest. Specifically, Defendant Ubben sold 3,000,000 shares of AppHarvest stock, comprising more than 25% of his Company holdings for proceeds of $49.5 million while in possession of non-public, undisclosed adverse information about the workforce problems at the Company and the negative impact of these labor issues on AppHarvest's profitability.

282.     Defendant Ubben's insider sales violated the federal securities laws, as well as the Company's Code of Conduct regarding "Insider Trading" which, in pertinent part, states:

> Employees, officers and ***directors who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes.*** All non-public information about the Company or about other companies is considered confidential information. To use material, non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to the Company's Insider Trading Policy for more detailed information. [Emphasis added.]

283.     Plaintiff, as a stockholder and representative of the Company, seeks restitution from Defendant Ubben, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Defendants as a result of their wrongful conduct and fiduciary breaches.

284.     As a direct and proximate result of Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

285.     Plaintiff, on behalf of AppHarvest, has no adequate remedy at law.

## COUNT IV

### Against The Director Defendants For Waste Of Corporate Assets

286.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

287.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

288.   As a result of the misconduct described above, the Director Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

289.   As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

290.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.   Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the

Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 15, 2022                    **RIGRODSKY LAW, P.A.**

By:  */s/ Gina M. Serra*
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: gms@rl-legal.com
Email: vl@rl-legal.com

*Attorneys for Plaintiff*